**In re MJK CLEARING, INC., Debtor.**

**Ferris, Baker Watts, Inc., Plaintiff,**

v.

**James P. Stephenson, Trustee, Defendant.**

**Adversary Nos. 01–4257, 01–4275.**

United States Bankruptcy Court, D. Minnesota.

Nov. 22, 2002.

**114**

Thomas E. Jamison, Minneapolis, MN, Charles S. Fax, Baltimore, MD, Richard A. Kirby, Washington, DC, for plaintiff.

Stephen M. Mertz, Ted R. Cheesebrough, Minneapolis, MN, for defendant.

Kenneth Caputo, Washington, DC, for Securities Investor Protection Corporation.

### MEMORANDUM ORDER GRANTING SUMMARY JUDGMENT

ROBERT J. KRESSEL, Bankruptcy Judge.

This proceeding came on for hearing on the parties Motions for Summary Judgment. Thomas E. Jamison, Charles S. Fax and Richard A. Kirby appeared for the plaintiff. Stephen M. Mertz and Ted R. Cheesebrough appeared for the defendant. Kenneth Caputo appeared for the Securities Investor Protection Corporation.

This court has jurisdiction over this matter pursuant to the Securities Investors Protection Act of 1970 and in particular the Protective Decree entered against the debtor under 15 U.S.C. § 78eee(b), as well as under 15 U.S.C. §§ 78eee(b)(2), 78eee(b)(4), and 28 U.S.C. §§ 1331 and 1332.

### THE PARTIES

The plaintiff, Ferris, Baker Watts is a Delaware corporation with its principal place of business in Washington, D.C., and is registered with the United States Securities and Exchange Commission as a securities broker-dealer. The debtor, formerly known as Miller Johnson & Kuehn, is a corporation organized under the laws of Minnesota with its principal place of business in Golden Valley, Minnesota. The debtor, until it suspended business activities on September 25, 2001, was engaged in the business of securities brokerage and trading.

FBW and MJK entered into a Master Securities Loan Agreement in January of 1999.[1] The agreement was amended on January 26, 1999. Pursuant to the MSLA, if one party borrowed securities from the other, the borrower would deposit with the lender cash or other collateral in an amount equal to at least one hundred percent of the market value of the loaned securities. The lender would pay the borrower a cash collateral fee for any cash given as collateral for loaned securities at a rate agreed between the parties, and would hold that collateral as security for the borrower's obligations with respect to the loan. Moreover, the MSLA provided that if the value of the securities increased in the market, the borrower would provide additional cash collateral to the lender. Conversely, if the value of the securities decreased, the stock lender would return the amount of the decrease. This process is known as "marking to market," which serves to equalize the value of the securities and the cash collateral. Finally, section 3.2 of the MSLA provided:

> In addition to the rights and remedies given to Lender hereunder, Lender shall have all the rights and remedies of a secured party under the New York Uniform Commercial Code. It is understood that Lender may use or invest the Collateral, if such consists of cash, at its own risk, but that (unless Lender is a Broker–Dealer) Lender shall, during the term of any Loan hereunder, segregate Collateral from all securities or other assets in its possession. Lender may pledge, repledge, hypothecate, rehypothecate, lend, relend, sell or otherwise transfer the Collateral, or re-register Collateral evidenced by physical certificates in any name other than Borrower's

only (a) if Lender is a Broker–Dealer or (b) in the event of a Default by Borrower.

The debtor's securities lending business involved transactions for one of three purposes: (1) loaning stock held by the debtor to raise capital; (2) borrowing stock to make deliveries; or (3) serving as a conduit/intermediary between parties. In this last type of transaction, the debtor would borrow securities from one party and loan those same securities to another party. In return, the debtor would receive cash collateral from the party to whom it loaned the securities, and the debtor would then post cash collateral with the party from which it borrowed securities as collateral for its own obligations.

All cash collateral received by MJK from any party to which it loaned securities was automatically reflected as a debit on MJK's account at the Depository Trust Company. Similarly, for every transaction in which MJK borrowed securities, MJK's DTC account reflected a credit representing the transfer of cash collateral out of the account. On any given day MJK's DTC account reflected numerous debits and credits that were the result of the plethora of securities transactions in which it participated. Each of these debits and credits were aggregated at the end of the day, providing a net amount for MJK's DTC account. As a consequence, any cash collateral posted by FBW or any other borrower of MJK was commingled with other cash collateral received by MJK from various securities transactions that day.

## MJK'S DEMISE

Prior to September 2001, MJK entered into stock loan agreements with other bro-

---

1. MJK involved itself in numerous stock lending and borrowing transactions with companies other than FBW, such as Native Nations. In each of these lending and borrowing transactions the debtor acted as a lender or a borrower of securities pursuant to a Master Securities Loan Agreement similar to the agreement between MJK and FBW.

ker-dealers, one of which was Native Nations Securities, Inc. Pursuant to a MSLA with NNS, during 2000 and 2001 MJK entered into a series of stock loan transactions with respect to three securities: (1) various issues of bonds by Imperial Credit Industries, Inc.; (2) shares of common stock of GenesisIntermedia, Inc.; and (3) shares of common stock of Holiday RV Superstores, Inc. On or around July 17, 2001, MJK borrowed from NNS $64,000,000 face amount of bonds issued by ICII that MJK listed at a carrying value of $63,210,000. FBW claims that with respect to such bonds, there were no records of them trading on the market in the ensuing three months and there was no record that they had any market value. With respect to the GENI stock, as of July 2001, MJK had on account 6,611,700 shares valued by MJK at $18 per share for a total value of $119,010,600. FBW claims that the 6,611,700 shares of GENI stock represented nearly one-third of the outstanding stock of GENI and could not reasonably be liquidated at the value carried by MJK. Concerning the Holiday RV stock, MJK on or around July 17, 2001, MJK borrowed from NNS 4,000,000 shares that MJK valued at $4 per share for a total of $16,000,000. FBW claims that the 4,000,000 shares of RVEE represented more than 50% of the outstanding stock of RVEE and could not reasonably be liquidated at the value carried by MJK. FBW also claims that as of July 17, 2001, MJK held a stock-borrow receivable from NNS in the amount of $198,221,600 on ICII, GENI, and RVEE, but these stocks were worth no more than $17,600,000, thus causing MJK to be unsecured in an amount not less than $180,621,600.

MJK reported in its quarterly Focus Report to the SEC for the quarter ending June 30, 2001, that the company had net capital of $21,906,498, a net capital requirement of $6,311,774, and therefore excess net capital of $15,574,724. FBW alleges, however, that as of July 17, 2001, taking into account the net capital requirement of $6,311,774 and the amount of its unsecured receivable from NNS, which FBW alleges is not less than $180,621,600, MJK was in violation of its net capital requirement.[2]

As of August 31, 2001, MJK reported to the SEC that it had a net capital of $22,528, 817, a net capital requirement of $7,645,029, and resulting in excess net capital of $14,883,788. FBW alleges, however, that MJK was in violation of its regulatory net capital requirements and insolvent from at least July 17, 2001, through the present and at no time did MJK inform the SEC of its net capital violations or insolvency. FBW also alleges that MJK's net capital deficiencies was caused by their failure to obtain the return of cash collateral from NNS when the market value of ICII bonds declined.

Prior to September 11, 2001, GENI shares traded consistently in the range of $17 per share. Its price for the purpose of establishing the amount of collateral held by NNS was generally fixed at $18 per share throughout the several months preceding September 11, 2001. Likewise, the mark set for shares of GENI that MJK loaned to other broker-dealers was $18 per share, and throughout July and August of 2001, and continuing through September 11, 2001, MJK's stock loan positions in GENI, as reflected in MJK's books, were matched on most days, meaning that the

---

2. FBW also states that MJK's reported net capital position did not change materially from July 17, 2001, through September 27, 2001, the date on which SIPC commenced its liquidation proceeding.

value of the securities corresponded to the value of the collateral.

On September 11, 2001, securities trading in the United States was halted. Trading was resumed on September 17, 2001. By the close of trading on September 17, 2001, the price of GENI stock had declined to $16.20 per share. On September 18, 2001, MJK paid GENI marks received from other broker-dealers in the amount of $7,211,400. FBW states that on that same date, MJK should have marked the price of GENI stock in the same amount to NNS and should have demanded that NNS return $7,211,400 in cash collateral. FBW alleges that MJK's failure to make such a demand created a collateral imbalance on the books of MJK in the amount of $7,211,400. FBW alleges that these factors required MJK to take a special charge to its net capital as of September 18, 2001, but that MJK failed to take a special charge. Had MJK taken this special charge, FBW alleges, MJK would have disclosed that it lacked the minimum stated capital necessary to operate.

The price of GENI stock continued to decline to a closing price of $13.38 per share on September 19, 2001. On that date, MJK satisfied marks at $3 per share on the 7,211,400 shares of GENI stock that it had lent to other broker-dealers, resulting in MJK's return of collateral to those broker-dealers in the amount of $21,634,200. FBW alleges that MJK did not demand that NNS return a like amount of cash collateral to MJK, and that this created a further collateral imbalance on the books of MJK in the amount of an additional $21,634,200. FBW alleges that this situation required MJK to take a further charge to its net capital as of September 20, 2001, and had MJK done this, MJK would have disclosed that its deficiency in

minimum capital necessary to operate was increased by $21,634,200.

On September 20, 2001, the price of GENI stock continued to decline for a fourth consecutive day to close at $10.96 per share. MJK thereupon received and met additional marks at $3 per share on the outstanding 7,211,400 shares of GENI stock, requiring MJK to return collateral in the amount of $21,634,200. FBW claims that MJK should have demanded that NNS return a like amount of cash collateral to MJK but MJK failed to do so. FBW also claims that this collateral imbalance required MJK to take a further charge to its net capital as of September 21, 2001, in the amount of $21,634,200, but MJK failed to act. Had such a charge been taken, argues FBW, MJK would have disclosed that its deficiency in minimum capital necessary to operate as a broker-dealer was increased by another $21,634,200.

On September 21, 2001, MJK contacted FBW and proposed a stock loan transactions whereby FBW would borrow two million shares of common stock of GENI stock and deposit cash collateral based on the closing price for the stock of $10.90 a share on September 20, 2001, rounded to $11 per share. FBW agreed to borrow the stock. Pursuant to the terms agreed by the parties and in accordance with the MSLA, the DTC transferred two million shares of GENI stock from MJK's account at DTC to FBW's account at the DTC.[3] In turn, the DTC transferred cash in the amount of $22,000,000 from FBW's account at the DTC to MJK's account at the DTC.

During the day of September 21, 2001, MJK settled numerous securities transactions through the DTC. Such transactions required MJK to pay funds to other parties in excess of the aggregate dollar value

**3.** FBW thereafter transferred the GENI stock to the account of A.G. Edwards.

paid to MJK. This resulted in MJK, at the close of business on September 21, 2001, owing the DTC $7,055,946.85, an amount that MJK paid from its bank account held at the Harris Bank. Accordingly, the $22,000,000 transferred from FBW's DTC account into MJK's DTC account was used that same day by MJK to satisfy its other ordinary business obligations.[4]

At the close of trading on September 21, 2001, the price of GENI had declined to $10 per share, down $1 from the price at the close of business on September 20, 2001. Pursuant to the terms of the MSLA, the stock was "marked to market" and MJK transferred to FBW $2,000,000 on September 24, 2001. On that same date, the price of GENI stock declined further to $9 per share. Again, the stock was "marked to market" and MJK transferred $2,000,000 to FBW the following morning. On September 25, 2001 [5], the price of GENI declined even further to $6 per share. FBW "marked to market" each stock borrow position that was open with MJK based on the price of the security that day, and demanded that MJK transfer to FBW an additional $6,000,000

to reflect the revised values of $6 per share for the GENI stock. MJK agreed, but failed to transfer the funds to FBW. That failure was an event of default under the MSLA. That same day, trading of GENI was halted,[6] and MJK notified federal regulators that it lacked sufficient net capital under applicable federal and self-regulatory rules to continue operations.

■ On September 27, 2001, at the request of the Securities Investors Protection Corporation,[7] the district court entered a Protective Decree against MJK under 15 U.S.C. § 78eee(b), appointed James P. Stephenson as trustee pursuant to 15 U.S.C. §§ 78aaa–111, and removed the case to the bankruptcy court.[8] Following these events, FBW received return of the GENI stock it transferred to A.G. Edwards, tendered that stock to the trustee, and requested the return of the money it posted with MJK. The trustee has not transferred any money to FBW. With respect to securities lending or borrowing positions other than those involving GENI stock, FBW and the trustee entered into novation agreements.[9] With respect to

---

4. Such a use was authorized by section 3.2 of the MSLA and is consistent with the practices of other broker-dealers in the industry.

5. Prior to September 25, 2001, MJK and FBW, pursuant to the MSLA, entered into various other securities transactions involving stock other than GENI. When FBW acted as a borrower of securities, it transferred cash to MJK pursuant to the MSLA. When FBW acted as a lender of securities, MJK transferred cash to FBW pursuant to the MSLA. Each business day, in accord with the terms of the MSLA, the parties "marked to market" the stock borrowed or loaned and transferred cash from one party to the other, through the DTC.

6. The trustee considers the value of GENI stock to be $0, even though it is now trading in "pink sheets" for pennies a share.

7. Although created by Congress, SIPC is neither a government agency nor a regulatory authority. It is a non-profit membership corporation funded by its member securities broker-dealers.

8. FBW states that these events constituted public acts of insolvency that triggered the automatic default without notice provisions of the MSLA, and as such, MJK had a duty to return all stock loan collateral held by it upon tender by FBW of the GENI and other stock. Of course, once a trustee was appointed, MJK lost the ability to transfer any money to FBW.

9. A novation is an agreement where one party, in this case MJK, removes itself from the middle of a conduit transaction. A conduit transaction is a securities lending transaction in which party B borrows securities from party A, and then re-lends those securities to

other non-GENI stock transactions in which FBW borrowed stock from MJK and MJK defaulted, FBW exercised its rights as borrower under section 13 of the MSLA [10], sold the stock in its possession and applied the proceeds of the sales to the obligation of MJK. With respect to non-GENI stock loan transactions in which FBW loaned securities to MJK and received cash from MJK, upon default by MJK, FBW exercised its rights as lender under the MSLA and set off the amount of cash it received from MJK against amounts MJK owed to FBW. The net effect of those transactions involving non-GENI stock is that MJK owes FBW $1,763,631. This, coupled with the $18,000,000 from the GENI transaction, brings the total amount of FBW's claim against MJK to $19,763,631.

## FBW'S CLAIMS

FBW has asserted four causes of action against the trustee relating to securities lending transactions entered into with the debtor. These claims include declaratory judgment/injunctive relief, specific performance, and constructive trust. The trustee moves for summary judgment on all of FBW's claims.

## SUMMARY JUDGMENT

Summary judgment as set forth in Rule 56(c) [11] is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue of material fact is genuine if it has a real basis in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) "A genuine issue of fact is material if it 'might affect the outcome of the suit under the governing law.'" *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court is required to view all evidence in the light most favor-

---

party C. A novation agreement removes party B from the transaction, so that the transaction becomes a stock loan directly from party A to party C.

10. Section 13 of the MSLA states:

Upon the occurrence of a Default under Section 11 entitling Borrower to terminate all Loans hereunder, Borrower shall have the right (without further notice to Lender), in addition to any other remedies provided herein or under applicable law, (a) to purchase a like amount of Collateral ("Replacement Collateral") in the principal market for such Collateral in a commercially reasonable manner, (b) to sell a like amount of the Loaned Securities in the principal market for such securities in a commercially reasonable manner and (c) to apply and set off the Loaned Securities and any proceeds thereof against (i) the payment of the purchase price for such Replacement Collateral (ii) Lender's obligations to return any cash or other Collateral and (iii) any amounts due to Borrower under Sections 4, 7, 17. In such event, Borrower may treat the Loaned Securities as its own and Lender's obligation to return a like amount of the Collateral shall terminate...Borrower may similarly apply the Loaned Securities and any proceeds thereof to any other obligation of Lender under this Agreement, including Lender's obligations with respect to distributions paid to Lender (and not forwarded to Borrower) in respect of Collateral. In the event that (i) the sales price received from such Loaned Securities is less than (ii) the purchase price of Replacement Collateral (plus the amount of any cash or other Collateral not replaced by Borrower and all other amounts, if any, due to Borrower hereunder), Lender shall be liable to Borrower for the amount of any such deficiency, together with interest...

11. Applicable here by operation of Fed. R. Bank. P. 7056.

able to the non-moving party and to give that party the benefit of all reasonable inferences to be drawn from the underlying facts disclosed in the pleadings. *Trnka v. Elanco Prod. Co.*, 709 F.2d 1223, 1225 (8th Cir.1983).

### Burden of the Moving Party

Procedurally, the movant has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record which show a lack of genuine issue. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party must show the court that there is an absence of evidence to substantiate the non-moving party's case. *Id.* at 325, 106 S.Ct. 2548. The movant discharges its burden by asserting that the record does not contain a triable issue and identifying that part of the record which supports the moving party's assertion. *City of Mt. Pleasant. Iowa v. Associated Electric Cooperative*, 838 F.2d 268, 273 (8th Cir.1988).

### Burden of the Non–Moving Party

When the moving party has carried its burden under Rule 56(c), the burden of production shifts to the non-moving party, and it must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. The non-moving party must go beyond the pleadings and by its own affidavits, depositions, answers to interrogatories, and admissions on file, establish that there are specific and genuine issues of material fact that warrant a trial. *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. The non-moving party must establish specific significant probative evidence supporting its case. *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). If the evidence presented is merely colorable or is not significantly probative, the non-moving party has not carried its burden and the court must grant summary judgment to the moving party. *See* Fed.R.Civ.P. 56(e).

After carefully reviewing the record, I conclude that the trustee has met his burden and that FBW has failed to present a genuine issue of any material fact. There is no dispute regarding any of the material facts in this case. The only disputes that exists are about whether FBW's claims can somehow rise in priority over the many general unsecured claims of the debtor's creditors. I conclude that the trustee is entitled to judgment as a matter of law on all of FBW's claims.

## DISCUSSION

### DECLARATORY JUDGMENT/INJUNCTIVE RELIEF

■ In its prayer for relief, FBW requests a declaration that the money held by the trustee derived from the stock lending transactions with FBW is not property of the estate within the meaning of 11 U.S.C. § 541. FBW further requests an order freezing not less than $19,763,631 of cash in possession of the trustee and an order directing the trustee not to use, sell or lease property of the estate or cash collateral in his possession without express consent of FBW or further order of the court. FBW is not entitled to this relief because it cannot identify any funds in the debtor's estate that currently belong to FBW. In coming to this conclusion, I look to the nature of the transfers of cash collateral from the debtor's DTC account, the rights and remedies of the parties as established in their Master Securities Loan Agreement, as well as the statutory laws stated in the Bankruptcy Code and the Uniform Commercial Code as adopted by the state of New York.

FBW cannot trace or identify the cash it posted with MJK. It is true that the books and records of the debtor identify the par-

ticular amounts of cash collateral posted by FBW to MJK. The trustee does not dispute that FBW posted cash collateral with MJK in exchange for loaned securities, and the debtor's DTC reports reflect such transactions. FBW cannot, however, trace and identify the particular assets in the possession of the trustee that FBW claims is its own, because once the debtor exercised its rights of alienability under section 3.2 of the MSLA and used the cash posted by FBW, the specific cash FBW once held no longer belonged to it. Moreover, under the MSLA, MJK was not required to segregate any cash for the benefit of FBW. Consequently, FBW cannot claim an interest in any specifically identifiable cash, and FBW is left with a claim against the debtor for damages, exactly as provided in section 13 of the MSLA.

FBW contends that the MSLA granted a security interest in favor of MJK as the lender FBW argues that under the Uniform Commercial Code as adopted by the state of New York, MJK as the secured party had a duty of reasonable care with regard to the cash collateral tendered to MJK by FBW, and an obligation to identify that cash collateral.

A secured party in possession of collateral is required to use reasonable care in the custody and preservation of that collateral. N.Y. U.C.C. § 9–207(a) (2002). Official Comment 2 to Article 9 § 9–207 of the Uniform Commercial Code further states that "under Section 1–102, the duty to exercise reasonable care may not be disclaimed by agreement, although under that section the parties remain free to determine by agreement standards that are not manifestly unreasonable as to what constitutes reasonable care." U.C.C. § 9–207, Comment 2 (2002); *see also Maple Securities U.S.A., Inc. v. Stephenson (In re MJK Clearing, Inc.)*, 2002 WL 31015219, at *4 (Bankr.D.Minn. Sept. 11, 2002). Under

section 3.2 of the MSLA FBW and MJK did determine what constituted reasonable care with regard to preservation and custody of the cash collateral. As section 3.2 of the MSLA states, "Lender may pledge, repledge, hypothecate, rehypothecate, lend, relend, sell or otherwise transfer the Collateral, or re-register Collateral evidenced by physical certificates in any name other than Borrower's only (a) if Lender is a Broker–Dealer or (b) in the event of a Default by Borrower." Because MJK was a broker-dealer, section 3.2 of the MSLA did not require MJK to segregate the collateral. FBW also gave MJK specific rights of alienability with regard to the collateral, and in fact MJK exercised those rights by disposing of the collateral the same day FBW transferred it. Furthermore, under § 9–207(b)(3)(2002), the cash collateral FBW posted with MJK was fungible collateral that could be commingled. MJK, pursuant to statute and parties' agreement, commingled the cash it received from all those who borrowed securities from MJK and spent it.

MJK as the secured party could use the collateral to the extent agreed to by the debtor. N.Y. U.C.C. § 9–207(b)(4)(C) (2002). FBW, pursuant to the New York Uniform Commercial Code and section 3.2 of the MSLA, gave MJK the right to pledge, repledge, hypothecate, rehypothecate, lend, relend, sell or otherwise transfer the Collateral. Essentially, FBW gave MJK permission to treat the cash it received as its own, and upon default, MJK was to return a *like amount* of cash to FBW that equaled the amount of cash collateral FBW posted with MJK. This obligation on the part of MJK essentially amounts to nothing more than a monetary debt, and FBW is entitled to an unsecured claim against MJK's estate for that debt. *In re MJK Clearing, Inc.*, 2002 WL 31015219, at *5.

Moreover, Official Comment 3 to Article 9 § 9–625 states that the basic remedy for the secured party's failure to comply with Article 9 is a damage recovery in the amount of loss caused by the non-compliance. U.C.C. § 9–625, Comment 3 (2002); *see also In re MJK Clearing, Inc.*, 2002 WL 31015219, at *5. Thus, FBW is entitled to a claim against MJK's estate in an amount equal to the amount of cash delivered to MJK pursuant to the MSLA, less the value of any securities delivered by MJK to FBW, plus interest through September 27, 2001. The trustee acknowledges that FBW has a claim against MJK, but argues that this claim merely falls into the category of a general unsecured claim, and on that point the trustee is correct.[12] *In re MJK Clearing, Inc.*, 2002 WL 31015219, at *5.

■ FBW also argues that a security interest attaches to any identifiable proceeds of collateral, and when those proceeds are commingled with other identifiable proceeds, normal methods of tracing apply. *See* N.Y. U.C.C. § 9–315(a)(2), (b)(2). The perfected security interest continues in proceeds to the extent the original security interest was perfected in the collateral. *Id.* at § 9–315(c). I find that FBW, however, cannot show a property interest of cash in any account of the debtor.

■ Courts have traced commingled funds in a bank account by using the "lowest intermediate balance" rule of tracing. Under the lowest intermediate balance rule, it is assumed the traced proceeds are the last funds withdrawn from a contested account. *Meyer v. Norwest Bank Iowa, Nat'l Ass'n,* 112 F.3d 946, 951 (8th Cir. 1997). Once the traced proceeds are withdrawn, however, they are treated as lost, even though subsequent deposits are made into the account. *Id.; see also* 5 Collier on Bankruptcy ¶ 541.11, at 541–70 (15th ed.2001).

First of all, FBW has not made an initial showing that the proceeds from the cash it transferred to MJK, pursuant to the non-GENI stock loan transactions, reached a particular bank account of MJK or any account currently in the possession of the trustee. When the res is money, it must be clearly traced and identified in specific property. *P.T. Tirtamas Majutama v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),* 142 B.R. 633, 637 (S.D.N.Y.1992). FBW has not done so.

■ Moreover, on September 21, 2001, the day of the GENI transaction, FBW transferred $22,000,000 to the debtor's DTC account, yet at the end of the day MJK's DTC account had a negative balance and even after the GENI transaction, MJK was still required to pay more than $7,000,000 to the DTC from its Harris Bank account. Thus, the cash FBW transferred to MJK's DTC account was untraceable once that account dipped to a negative balance. Where all of the moneys are withdrawn, the equity of the cestui is lost, although moneys from other sources are subsequently deposited in the same account. *Id.* at 638.

FBW argues that I should look at the overall cash position of MJK or the debtor's overall assets in order to trace the proceeds, if any, from the cash it posted with MJK. FBW also states that at no time between September 21, 2001 and September 27, 2001, did MJK have less than $27,000,000 of cash and cash equivalents available to it. First, the point of tracing is to follow the *particular* entrusted assets,

---

**12.** A claim for amounts lost pursuant to a failed securities loan transaction is classified as a general unsecured claim. *In re Muir & Co.,* 51 B.R. 150, 154 (Bankr.S.D.N.Y.1985).

not simply to identify *some* assets. *Connecticut General Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 620 (1st Cir.1988) (emphasis in the original). Second, the fact remains that FBW has not traced any proceeds of the money it posted with MJK to any account of the debtor or to any account now in the possession of the trustee.

*Applicability of 11 U.S.C. § 544(a)*

■ Even if FBW had an interest in either the cash in possession of the trustee, the trustee could avoid such interests.[13] *In re MJK Clearing, Inc.*, 286 B.R. 862, 874. The trustee as hypothetical lien creditor can avoid, under 11 U.S.C. § 544(a)(1), any interest of FBW in the funds transferred by FBW to MJK pursuant to the MSLA. FBW argues that 11 U.S.C. § 544[14] is inapplicable because MJK held a mere security interest in the money FBW posted with MJK pursuant to the stock loan transactions. Moreover, FBW argues that under 11 U.S.C. § 541(d), the cash it posted with MJK is excluded from MJK's estate because MJK holds only bare legal title with no equitable interest.

■ First, the property of the bankruptcy estate is broadly defined in § 541(a)(1) of the Bankruptcy Code. *Sosne v. Reinert & Duree, (In re Just Brakes Corporate Systems, Inc.)*, 108 F.3d 881, 884 n. 2 (8th Cir.1997). The commencement of a case under the Bankruptcy Code creates an estate which is comprised of virtually all the legal and equitable interests of the debtor in property wherever located, and that any exception or exclusion from the estate must be narrowly construed. *In re Powell,* 187 B.R. 642, 644 (Bankr.D.Minn.1995). The scope of the estate is broad and all encompassing. *Patterson v. Shumate*, 504 U.S. 753, 757, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992); *see also U.S. ex rel Gebert v. Transport Admin. Serv.*, 260 F.3d 909, 913 (8th Cir.2001) (stating that estate property is broadly defined and encompasses conditional, future, speculative and equitable interests of the debtor). The right of complete alienability, given to the debtor by FBW, is sufficient to make the cash it posted with MJK property of the estate. *In re MJK Clearing, Inc.*, 286 B.R. 862, 875. Thus, the amounts in the debtor's bank account at the commencement of its liquidation proceeding is property of the estate under 11 U.S.C. § 541(a)(1).

■ The extent of the trustee's rights as a judicial lienholder or judgment creditor is measured by the state law governing the property in question. 5 *Collier on Bankruptcy* ¶ 544.02, at 544–5 (Alan N. Resnick & Henry J. Sommer, eds., 15th rev. ed.2002); *see also In re Greenhaven Village Apartments of Burnsville Phase II Limited Partnership*, 100 B.R. 465, 468 (Bankr.D.Minn.1989). Regarding the funds in the possession or control of the trustee, even if FBW could demonstrate that it had an interest in these funds, the trustee can avoid such interest under 11 U.S.C. § 544(a). In Minnesota, the debt-

---

13. The fundamental purpose of Article 9 is to create certainty by allowing creditors to rely on specific perfection and priority rules that govern collateral within the scope of Article 9. *The Boatmen's National Bank of St. Louis v. Sears, Roebuck and Co.*, 106 F.3d 227, 230–231 (8th Cir.1997). Under the MSLA, FBW was not a creditor of MJK but was a borrower. Thus, perfection of any interest FBW would have had would not be contemplated under the U.C.C.

14. Section 544(a) is applicable to this proceeding pursuant to 15 U.S.C. § 78fff(b). The trustee has the powers of a trustee under Section 544(a) of the Bankruptcy Code, and has the status of a hypothetical lien creditor or judgment creditor of the debtor.

or's principal place of business, the holder of a judicial lien against the debtor or a judgment creditor of the debtor would have the right to garnish any funds on deposit in any of the debtor's deposit accounts to satisfy such lien or judgment. Minn.Stat. § 571.71–571.932 (2002). Such garnishment would attach to all funds in the debtor's deposit accounts, and prime any interest that FBW would have had in such funds. Minn.Stat. § 571.81 (2002).

## SPECIFIC PERFORMANCE

▮▮▮▮ Count one, two and five of FBW's complaint seek the immediate return of cash based on MJK's breach of the MSLA. Though FBW does not state that it requests specific performance, FBW is essentially asserting a claim against the trustee for specific performance requiring the trustee to return $19,763,631 that was transferred by FBW to MJK pursuant to the securities lending transactions at issue.[15] I find that FBW is not entitled to specific performance.

▮▮▮▮ Specific performance is an equitable remedy which compels performance of a contract. 3 Dan B. Dobbs, *Law of Remedies* 189–190 (2d ed.1993). A request to compel the specific performance of a contract is an application of the sound discretion of the court. *Pope Mfg. Co. v. Gormully*, 144 U.S. 224, 237, 12 S.Ct. 632, 637, 36 L.Ed. 414 (1892); *Fred O. Watson Co. v. United States Life Ins. Co. in City of New York*, 258 N.W.2d 776, 778 (Minn. 1977). In general, specific performance of a contract relating to personal property will not be granted because the violation of such a contract may be estimated in damages. *Moulton v. Warren Mfg. Co.*, 81

Minn. 259, 259–62, 83 N.W. 1082, 1082–83 (1900) (stating that specific performance of a contract for the transfer of personal property, as a general rule, will not be ordered except when an action at law cannot provide an adequate remedy, (such as when the value of the property cannot be readily ascertained), or the chattel has a value peculiar to the person seeking relief); *Alsdorf v. Svoboda*, 239 Minn. 1, 8, 57 N.W.2d 824, 829 (1953) (stating that ordinarily, specific performance of a contract relating to personal property will not be granted). Specific performance will not be decreed when, for any reason, it would be inequitable. *Buckley v. Patterson*, 39 Minn. 250, 39 N.W. 490 (1888). A party does not have an automatic right to specific performance as a remedy for breach of a contract, the court must balance the equities of the case and determine whether the equitable remedy of specific performance is appropriate. *Pope Mfg. Co.*, 144 U.S. at 237, 12 S.Ct. 632; *Dakota County HRA v. Blackwell*, 602 N.W.2d 243, 244 (Minn. 1999) (citing *Boulevard Plaza Corp. v. Campbell*, 254 Minn. 123, 136, 94 N.W.2d 273, 284 (1959)). An agreement will be enforced "where the specified thing or act contracted for, and not mere pecuniary compensation, is the redress practically required." *Butler Bros. Co. v. Levin*, 166 Minn. 158, 162, 207 N.W. 315, 317 (1926) (quoting *Irvine v. Armstrong*, 31 Minn. 216, 218, 17 N.W. 343 (1883)).

▮▮▮▮ Granting specific performance when there is a valid contract and an adequate remedy at law is inappropriate. *U.S. Fire Ins. Co. v. Minnesota State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981) (stating that equitable relief, (the

---

**15.** Minnesota law applies to FBW's claim for specific performance. Matters of procedure and remedy are governed by the law of the forum. *Davis v. Furlong*, 328 N.W.2d 150, 153 (Minn.1983). The court of the forum, subject to only the limits of the federal constitution, determines whether a given question involves one of substance or of remedy. *Anderson v. State Farm Mut. Auto. Ins. Co.*, 222 Minn. 428, 24 N.W.2d 836, 839 (1946).

equitable relief sought was unjust enrichment), cannot be granted where the rights of the parties are governed by a valid contract); *Northern Trust Co. v. Markell,* 61 Minn. 271, 272, 63 N.W. 735 (1895) (stating as a general rule specific performance relating to personal property will be denied because the law affords ade- quate redress in an action for damages). The MSLA is a valid contract governing the relationship between the parties as well as the remedies of both. *See Section 12 and 13 of the MSLA.* FBW's claim for damages under the MSLA provides it with an adequate remedy at law, and such a remedy is exactly what the parties bargained for. Moreover, this is not the type of situation where the property involved is so unique that the measure of damages is difficult to calculate, thus warranting specific performance. *See Nason v. Barrett,* 140 Minn. 366, 370, 168 N.W. 581, 582 (1918) (finding that one of the reasons specific performance for the sale of stock was warranted in the case was because its value was not easily ascertainable). In addition, what FBW is essentially requesting is mere pecuniary compensation. A court of equity, however, will not specifically enforce an action to pay money. *Butler Bros. Co.,* 166 Minn. at 162, 207 N.W. at 317; *see also Raton Waterworks Co. v. Town of Raton,* 174 U.S. 360, 364, 19 S.Ct. 719, 720, 43 L.Ed. 1005 (1899) (stating that an action at law is the proper remedy to enforce payments of money). Finally, one of the cardinal rules of a court in the exercise of its discretion in granting or denying specific performance is that it must appear that specific performance will not result in injustice. *Willard v. Tayloe,* 8 Wall. 557, 75 U.S. 557, 567, 19 L.Ed. 501 (1869) (stating that in general it may be said that specific relief will be withheld when it is apparent, from a view of all the circumstances of the particular case, that it will produce hardship or injustice). By awarding FBW specific performance and requiring the trustee to return $19,763,631, FBW, who is currently an unsecured creditor, would obtain a preference over other unsecured creditors of the debtor's estate. Such a result would be inequitable and would result in injustice.

## CONSTRUCTIVE TRUST

Counts four and six of FBW's complaint asserts a claim for a constructive trust.[16] FBW argues that MJK converted the cash collateral it posted with MJK and was unjustly enriched by the proceeds of that collateral. FBW argues that MJK committed fraud on FBW in soliciting the cash collateral for GENI stock and other stock loans. FBW states that no later than August 31, 2001 and perhaps as early as March 2001, that MJK was operating in violation of net capital requirements. FBW argues that MJK (1) misrepresented its financial condition to FBW; (2) misrepresented to the Securities and Exchange Commission its financial status; (3) knew it would be unable to return FBW's collateral because MJK was insolvent; (4) was in violation of its regulatory net capital requirements; and (5) would have been shut down by the Securities and Exchange Commission before inducing trades from FBW had MJK not misrepresented its financial situation to the Securities and Exchange Commission. FBW further argues that MJK was required to disclose such facts to securities regulators and to FBW prior to entering into any stock loan transactions but failed to do so, and that the fraud perpetrated against FBW by MJK supports FBW's claim for a constructive

---

**16.** FBW also sets forth counts III and VII, which seek judgment for damages with respect to the GENI and other securities loans.

In its answer, the trustee admits liability as to these counts with respect to damages for breach of the MSLA.

trust on the identifiable collateral proceeds for the GENI stock as well as the other stock loans. At the outset I note that if the property was actually FBW's property, creation of a constructive trust would be unnecessary. To the extent the trustee is not holding FBW's property, imposition of a constructive trust is inappropriate. *In re MJK Clearing, Inc.*, 286 B.R. 862, 880.

▮ "The imposition of a constructive trust is an equitable remedy which the court has discretion to grant or deny." *In re Dynamic Technologies Corp.*, 106 B.R. 994, 1007 (Bankr.D.Minn.1989) (citing *Thompson v. Nesheim*, 280 Minn. 407, 414, 159 N.W.2d 910, 916 (1968)). The imposition of a constructive trust in bankruptcy may be appropriate if it would be sufficient under applicable state law. *Kunkel v. Ries (In re Morken)*, 199 B.R. 940, 964 (Bankr.D.Minn.1996); *see also N.S. Garrott & Sons v. Union Planters Nat'l Bank*, 772 F.2d 462, 466 (8th Cir.1985) (stating that imposition of a constructive trust is appropriate only where it would be applicable under state law). However, it is the federal bankruptcy law that ultimately determines whether a constructive trust is appropriate in a bankruptcy case. *Kunkel v. Ries (In re Morken)*, 199 B.R. at 964. The unique considerations involved in a bankruptcy case must drive the result on the constructive trust issue. *Id.* There is no unyielding formula for a court to apply in decreeing a constructive trust. *Knox v. Knox*, 222 Minn. 477, 481, 25 N.W.2d 225, 228 (1946). Under Minnesota law, a court may impose a constructive trust only when there is clear and convincing evidence that a constructive trust is necessary to prevent unjust enrichment. *In re Estate of Eriksen*, 337 N.W.2d 671, 674 (Minn.1983) (citing *Knox*, 222 Minn. at 481, 25 N.W.2d at 228). A constructive trust will arise "whenever the legal title to property is obtained through fraud, oppression, duress, undue influence, force, crime, or similar means, or by taking improper advantage of confidential or fiduciary relationship." *Bly v. Gensmer*, 386 N.W.2d 767, 769 (Minn.App.1986) (quoting *Wright v. Wright*, 311 N.W.2d 484, 485 (Minn.1981)). A constructive trust may be imposed only where there is some specific property identified as belonging, in equity and conscience, to the plaintiff. *Rock v. Hennepin Broadcasting Associates, Inc.*, 359 N.W.2d 735, 739 (Minn.App.1984). Imposition of a constructive trust requires that the subject of the trust can be traced and identified with a sufficient degree of specificity. *In re Dartco, Inc.*, 197 B.R. 860, 868–869 (Bankr.D.Minn.1996).

### Fraud

▮ First, FBW has failed to prove all of the elements of fraud. In Minnesota, to establish fraudulent misrepresentation there must be (1) a representation; (2) the representation must be false; (3) the representation must have to do with a present or past fact; (4) that fact must be material; (5) it must be susceptible of knowledge; (6) the representer must know it to be false or in the alternative, must assert it as of his own knowledge without knowing whether it is true or false; (7) the representer must intend to have the other person induced to act, or justified in acting upon it; (8) that person must be so induced to act or so justified in acting; (9) that person's action must be in reliance upon the representation; (10) that person must suffer damage; (11) that damage must be attributable to the misrepresentation, that is, the statement must be a proximate cause of the injury. *M.H. v. Caritas Family Services*, 488 N.W.2d 282, 289 (Minn.1992) (citing *Florenzano v. Olson*, 387 N.W.2d 168, 174 n. 4 (Minn.1986)); *Digital Resource, L.L.C. v. Abacor, Inc.*

*(In re Digital Resource, L.L.C.)*, 246 B.R. 357, 367 (8th Cir. BAP 2000). A misrepresentation may be made either (1) by an affirmative statement that is itself false or (2) by concealing or not disclosing certain facts that render the facts that are disclosed misleading. *Id.*

In this case, FBW has not provided facts sufficiently supported in the record to prove that MJK intended to mislead FBW by either misstating facts or deliberately failing to disclose facts regarding its financial position.[17] Moreover, FBW has failed to prove that management of the debtor intended FBW to rely on alleged misrepresentations or that FBW in fact relied on such misrepresentations when it agreed to enter into the stock loan transactions with MJK.

### Unjust Enrichment

 Secondly, there is no clear and convincing evidence that a constructive trust is necessary to prevent unjust enrichment in this case. Unjust enrichment has been invoked in support of claims based upon the failure of consideration, fraud, mistake, and in other situations where it would be morally wrong for one party to enrich himself at the expense of another. *Cady v. Bush*, 283 Minn. 105, 110, 166 N.W.2d 358, 361–362 (1969). Unjust enrichment claims do not lie simply because one party benefits from the efforts of others, instead "it must be shown that a party was unjustly enriched in the sense that the term unjustly could mean illegally or unlawfully." *Schumacher v. Schumacher*, 627 N.W.2d 725, 729 (Minn.Ct.App.2001) (quoting *First Nat'l Bank of St. Paul v. Ramier*, 311 N.W.2d 502, 504 (Minn.1981)). Unjust enrichment is an equitable claim that arises when a party gains a benefit

illegally or unlawfully, and there is no valid contract completely governing the rights of the parties. *Stein v. O'Brien*, 565 N.W.2d 472, 474 (Minn.Ct.App.1997). It must be kept in mind that the principle of unjust enrichment should not be invoked merely because a party has made a bad bargain. *Cady v. Bush*, 283 Minn. at 110, 166 N.W.2d at 362. Courts are not warranted in interfering with the contractual rights of parties as evidenced by their writings which purport to express their full agreement. *Id.*

Here there is a valid contract completely governing the rights of the parties, and I will not interfere with the contractual rights and remedies that were bargained for by FBW and MJK. The MSLA clearly identifies the rights and remedies of both parties. Also, there was no actionable fraud, and FBW has not proven that the debtor or the trustee committed any illegal or unlawful acts. Finally, in this case there is no merit to the argument that without a constructive trust MJK would be allowed to retain the fruits of their fraud, and it is incorrect both factually and legally. The debts of MJK far exceed its assets. MJK will not retain any funds in the estate. Rather, any funds of MJK still held by the trustee will be distributed to its creditors.

### Conversion

 Third, MJK did not convert FBW's property. Conversion exists when a defendant has wrongfully exercised dominion over a plaintiff's personalty that is without justification or that is inconsistent with the rights of the person entitled to use, possession, or ownership of the property. *Fawcett v. Heimbach*, 591 N.W.2d 516, 519–520 (Minn.Ct.App.1999). A dis-

---

**17.** Many of the "facts" that FBW notes in its briefs to support its argument for fraud on the part of MJK are not facts at all but are conclusory statements, which essentially amount to nothing more than allegations, made by various persons such as expert Norman Frager in his report.

position of property consented to by the owner is not a conversion of that property. *Griffin v. Bristle*, 39 Minn. 456, 458, 40 N.W. 523 (1888); *see also Nieter v. McCaull–Dinsmore Co.*, 159 Minn. 395, 399, 199 N.W. 85, 86 (1924) (stating that if appellant's assignors consented to the shipment of their grain to a terminal market, there was no unauthorized dominion over their property before it was sold in the market, and hence an action for conversion would not lie); *Carlson v. Schoch*, 141 Minn. 236, 238, 170 N.W. 195, 196 (1918) (stating that a correct statement of the law is conversion does not lie when the property was taken under an agreement with the plaintiff and therefore with his knowledge and consent).

In this case, a conversion of FBW's property did not occur. FBW expressly granted MJK permission to pledge, repledge, hypothecate, rehypothecate, lend, relend, sell or otherwise transfer the collateral. MJK in fact exercised these rights. A conversion cannot occur when the owner gives consent to the disposition of that property. *Griffin*, 39 Minn. at 458, 40 N.W. at 523–524.

Moreover, the cash collateral in dispute was not obtained through fraud, oppression, duress, undue influence, force, crime, or by taking improper advantage of a con-fidential or fiduciary relationship. The MSLA specifically granted the debtor the right to pledge, repledge, hypothecate, rehypothecate, lend, relend, sell or otherwise transfer or re-register the collateral. Consequently, the debtor was well within its rights to transfer the cash collateral. Also the debtor, pursuant to terms of the MSLA, was not required to segregate the collateral. Furthermore, FBW has failed to establish a cause of action for fraud and conversion and has not proven that the debtor or the trustee acted in any criminal or illegal manner.

### Tracing

Fifth, FBW has not been able to trace and identify with specificity the cash collateral that it posted with the debtor. As stated earlier, FBW has not traced the proceeds of any cash it posted with MJK to any account of the debtor or to any account now in the possession of the trustee.

### Post–Petition Constructive Trust on Property of the Estate

 Finally, FBW's claim for a constructive trust fails because imposition of a post-petition constructive trust is inappropriate when its effect is to give the plaintiff a preference over other creditors.[18] *Kunkel v. Ries (In re Morken)*, 199

---

**18.** Courts are split as to whether constructive trusts can be imposed in bankruptcy cases. *In re Morken*, 199 B.R. 940, 964 (Bankr. D.Minn.1996); *Shubert v. Jeter (In re Jeter)*, 171 B.R. 1015, 1020 (Bankr.W.D.Mo.1994), *aff'd*, 73 F.3d 205 (8th Cir.1996). The Eighth Circuit has not placed a total ban on constructive trusts, but allows them in very limited circumstances. *Kunkel v. Ries (In re Morken)*, 199 B.R. at 964. The circumstances under which the Eighth Circuit has allowed imposition of a post-petition constructive trust involved creditors who asserted ownership interests in exempt property, not property of the estate. *Id*. In *Chiu v. Wong*, the debtors misappropriated funds and invested the money in exempt homestead property in order to shield the funds from creditors. *Chiu v. Wong*, 16 F.3d 306 (8th Cir.1994). There the Eighth Circuit imposed a post-petition constructive trust on the exempt homestead property because the trust was imposed on the debtor's property, and did not diminish the estate to the detriment of other creditors. The Eighth Circuit may also allow imposition of a post-petition constructive trust to prevent a fraudulent debtor from being unjustly enriched. *See Shubert v. Jeter (In re Jeter)*, 171 B.R. at 1020. In *Jeter* the bankruptcy court found that the creditor's claim for a constructive trust was a disguised attempt to recover pre-petition fraudulent transfers. The Eighth Circuit affirmed the bankruptcy and district courts, holding that

B.R. at 964–965. FBW asserts the remedy of a constructive trust as a general unsecured creditor. Constructive trusts cannot be used to alter the priority scheme explicitly prescribed by Congress. *Id.* at 966. If a creditor claims a constructive trust on property of the estate, there is a conflict with the Code's priority rules because one creditor would be preferred over the other creditors in contravention of the Bankruptcy Code's detailed distribution scheme. *Id.* FBW is not entitled to a constructive trust because doing so would allow FBW to rise in priority over other general unsecured creditors and such a result is not in agreement with the Bankruptcy Code. Unless a court has already impressed a constructive trust upon certain assets the claimant cannot properly represent to the Bankruptcy Court that he was, at the time of commencement of the case, a beneficiary of a constructive trust held by the debtor. *Id.* No constructive trust was imposed on the behalf of FBW at the commencement of the debtor's bankruptcy case.

Although a post-petition constructive trust may be imposed to prevent a fraudulent debtor from being unjustly enriched, FBW has not proven that the circumstances of this case support the imposition of a post-petition constructive trust. The circumstances of this case simply do not rise to a level so egregious as to warrant the disruption of priority schemes. Not only would it be inequitable to allow FBW to advance itself ahead of the general creditor body, there are other broker-dealers with claims that exceed the amount the trustee has on hand.[19]

### SIPA CUSTOMER PROPERTY

 Finally, FBW cannot prevail because most, if not all, of the cash in the trustee's possession is part of the customer property of the debtor. This is a liquidation proceeding under the Securities Investor Protection Act. While many provisions of the Bankruptcy Code generally apply, where SIPA is inconsistent with the Bankruptcy Code, it is the specific provisions of SIPA that control. 15 U.S.C. § 78fff(b) provides that chapters 1, 3, and 5 and subchapters I and II of Chapter 7 of the Bankruptcy Code apply to the extent consistent with SIPA. 15 U.S.C. § 78fff(b) (2002); *In re Adler Coleman Clearing Corp.,* 198 B.R. 70, 74 (Bankr.S.D.N.Y. 1996). In this case, all the cash in the debtor's possession on the filing date constituted "customer property" under SIPA. SIPA's requirements regarding the allocation of customer property override all state law or bankruptcy law rights.

The provision of the Securities Investor Protection Act which defines customer

---

because the debtor was not unjustly enriched by his fraud, the creditor was not entitled to any special rights. The court compared the circumstances in *Jeter* to those in *Chiu v. Wong* and reasoned that unlike the remaining creditors in *Chiu v. Wong,* the other creditors in *Jeter* would have been prejudiced by the imposition of a trust favoring one particular creditor. *Shubert v. Jeter,* 73 F.3d at 207 n. 2. Thus in the Eighth Circuit there are at least two requirements before a constructive trust can be imposed: the debtor's misconduct allows principles of equity to override legal considerations, and the contest is between a creditor and the debtor, not among creditors.

*Kunkel v. Ries (In re Morken),* 199 B.R. at 956.

19. Among those who have claims similar to FBW are: E* Trade-$64,736,900, Nomura-$19,700,000, Baird-$7,965,000, Dax-$9,200,700, Maple Securities-$1,414,780. Added to FBW's claim of $19,763,631, there are broker-dealers with claims of over $103,000,000. When the trustee took over he had total property of about $43,000,000, all of which has been distributed to customers and creditors, supplemented by advances of $194,000,000 from SIPC.

property is 15 U.S.C. § 78*lll*(4) which states:

> The term "customer property" means cash and securities (except customer name securities delivered to the customer) at any time received, acquired or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted. The term "customer property" includes—
>
> (A) securities held as property of the debtor to the extent that the inability of the debtor to meet its obligations to customers for their net equity claims based on securities of the same class and series of an issuer is attributable to the debtor's noncompliance with the requirements of section 78o(c)(3) of this title and the rules prescribed under such section;
>
> (B) resources provided through the use or realization of customers' debit cash balances and other customer-related debit items as defined by the Commission by rule;
>
> (C) any cash or securities apportioned to customer property pursuant to section 78fff(d) of this title; and
>
> (D) *any other property of the debtor which, upon compliance with applicable laws, rules, and regulations, would have been set aside or held for the benefit of customers,* unless the trustee determines that including such property within the meaning of such term would not significantly increase customer property.

15 U.S.C. § 78*lll*(4) (2002) (emphasis added). FBW argues that since the Securities and Exchange Commission suspended the requirement to make special reserve deposits, pursuant to SEC Rule 15c3–3, due to the 9/11 terrorist attacks, MJK had no requirement to segregate cash for the week ending September 14, 2001, for the benefit of customers under applicable SEC Rules. Therefore, FBW argues, as of September 21, 2001, the date of the GENI stock loan transaction, MJK had no requirement to segregate cash for the benefit of customers under applicable SEC rules and there is no basis to find that FBW's cash was customer property within the meaning of SIPA. FBW further argues that ordinary principles of bankruptcy law apply to FBW's collateral, and that under such law the cash is not property of the debtor's estate. This misstates actions taken by the SEC after September 11.

On the filing date of the debtor's liquidation proceeding, the debtor, pursuant to SEC Rule 15c3–3, 17 C.F.R. § 240.15c3–3, should have segregated all cash in its possession for the benefit of customers, to the exclusion of other creditors. The applicable laws, rules, and regulations referred to in subsection (D) of the "Customer Property" definition in SIPA are found, essentially in 17 C.F.R. § 240.15c3–3, and is known as the "Customer Protection Rule." This rule was adopted by the SEC following Congress' enactment of SIPA, which was designed to, among other things, "restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers." *SIPC v. Barbour*, 421 U.S. 412, 415, 95 S.Ct. 1733, 1736, 44 L.Ed.2d 263 (1975) (citing S.Rep. No. 91–1218, pp. 2–4 (1970); H.R.Rep. No. 91–1613 pp. 2–4 (1970); U.S.Code Cong. & Admin.News 1970, p. 5254). The purpose of the Customer Protection Rule is also to ensure that customer property in a failed brokerage firm is available to satisfy the claims of customers, and the rule requires a broker-dealer to maintain possession or control of all fully-paid and excess margin securities, 17 C.F.R. § 240.15c3–3(a)(3) (2002), and to make and maintain a deposit in a separate

account at a bank equal to the net amount of funds owed to customers. 17 C.F.R. § 240.15c3–3(e)(1) (2002).

A broker-dealer must establish a separate bank account for the deposit of cash equal to the net amount owed to customers. This account is called the Special Reserve Bank Account for the Exclusive Benefit of Customers. *See* 17 C.F.R. § 240.15c3–3(e)(1) (2002). The amount of funds to be deposited in the Reserve Account is computed on a weekly basis pursuant to Formula For Determination for Reserve Requirements For Brokers and Dealers. *See* 17 C.F.R. § 240.15c3–3(a) (2002). The Reserve Formula is designed to eliminate the use of customers' funds and securities by broker-dealers in financing firm overhead and such dealer activities as market making, proprietary trading, and underwriting. *See Whiteside & Co. v. SEC,* 557 F.2d 1118, 1121 (5th Cir. 1977), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538 (1978); Loss and Seligman, *Securities Regulation,* 3d Ed., Vol. VII, pp. 3169–3173.

A calculation of the Reserve Formula for the debtor on the filing date indicates that all cash held by the debtor should have been set aside for customers, yet the debtor failed to do so. MJK's failure to comply with SEC Rule 15c3–3, however, negates FBW's attempt to freeze any cash collateral in the estate, because SIPA requires the trustee to correct the debtor's failure to comply, and apportion that cash to "customer property" as if the debtor had complied with the appropriate regulations. *See* Hearings Before the Subcommittee on Consumer Protection and Finance of the Committee on Interstate and Foreign Commerce, 95th Cong., 1st Session, on H.R. 8331, August 1, 2, and 3, 1977, at 190.

Moreover, what the SEC suspended on September 11, 2001, was merely the requirement to perform the weekly computation pursuant to the Reserve Formula. The SEC did not suspend the requirement to maintain customer funds in the Reserve Account. Furthermore, the SEC took no action altering broker-dealers' requirements to maintain possession or control of all fully-paid and excess margin securities. *See* 17 C.F.R. § 240.15c3–3(a)(3) (2002).

FBW ignores the fact that customer property entails more than merely the Reserve Account. In addition to "cash and securities...at any time received, acquired, or held by or for the account of a debtor from or for the securities account of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted," 15 U.S.C. § 78*lll*(4) (2002), the term customer property also includes "any other property of the debtor" as expansively referred to in subsection (D). Such property is "that property that would have been set aside or held for the benefit of customers under applicable laws, rules, and regulations." 15 U.S.C. § 78*lll*(4) (2002); *See also Horwitz v. Sheldon (In re Donald Sheldon & Co.),* 148 B.R. 385, 390 (Bankr.S.D.N.Y. 1992). As Collier on Bankruptcy states, this subsection is more expansive than that contained in the Bankruptcy Code:

> SIPA...includes in customer property such property as *would* have been set aside or held for the benefit of customers *upon compliance* with applicable laws, rules and regulations. While the Bankruptcy Code makes only the actual contents of a special reserve bank account required to be maintained pursuant to applicable law for the benefit of customers a part of the fund of customer property, *SIPA permits the trustee to look beyond the Special Reserve Account to the debtor's other (i.e. non-customer) bank accounts to make up any deficiency in the Special Reserve Account.*

Collier on Bankruptcy, Vol. 6, ¶ 741.05[3][c] (15th ed.2001) (emphasis added). Pursuant to SIPA § 78fff(b), the provisions of the Bankruptcy Code apply in a SIPA proceeding only to the extent consistent with SIPA. Thus, to the extent provisions of the Bankruptcy Code conflict with SIPA, the latter must control.

In the present case, there exists a massive shortfall in customer property. Application of the plain meaning of 15 U.S.C. § 78*lll*(4)(D) provides a means to rectify any actions taken by, or with respect to, the debtor, that results in such a shortfall. This clearly entails looking to the debtor's other, non-customer accounts such as banking accounts containing funds related to the debtor's stock loan/stock borrow business, to remedy the shortfall for the protection of customers. Thus, if the debtor failed for any reason to set aside or hold for the benefit of customers sufficient property, 15 U.S.C. § 78*lll*(4)(D) would require the trustee to correct the debtor's error.

In other words, FBW's assertion that the Customer Protection Rule deposit requirement had been suspended, even if true, is irrelevant. Customer property clearly entails more than merely the deposit a broker-dealer makes in the Reserve Account pursuant to the Reserve Formula, suspension of or even negating that one component would not render the remaining requirements, including the possession or control of all fully paid and excess margin securities, ineffective. Rather, it is the shortfall in customer property that drives the analysis of what property should be allocated to customer property in order to benefit customers. Indeed, such a reading of customer property, and treatment of the debtor's assets is the only reading and treatment consistent with SIPA. "The object of [SIPA], and the function of the [SIPC] it created, is to protect the public customer of securities dealers from suffering the consequences of financial instability in the brokerage industry." *SEC v. F.O. Baroff Co., Inc.,* 497 F.2d 280, 281 (2d Cir.1974); *see also SEC v. Packer, Wilbur & Co., Inc.,* 498 F.2d 978, 980 (2d Cir.1974) (stating that SIPA was a legislative effort to reinforce the flagging confidence in the securities market by providing an extra margin of protection for the small investor). In order to effect such a purpose, SIPA included provisions designed to upgrade financial responsibility rules and requirements of broker-dealers, which ultimately led to the enactment of 17 C.F.R. § 240.15c3–3. The number one purpose of a SIPA liquidation proceeding is to "deliver customer name securities to or on behalf of customers,"... and "to distribute customer property and"... "satisfy net equity claims of customers..." 15 U.S.C. § 78fff(a) Further, a SIPA liquidation proceeding entails special protections for customers by "allowing them to receive a preference over general creditors..." *SIPC v. Executive Securities Corp.,* 423 F.Supp. 94, 96 (S.D.N.Y.1976), *aff'd,* 556 F.2d 98 (2d Cir. 1977).

Since all of the debtor's cash was customer property when the trustee was appointed, he is required to allocate that cash pursuant to § 78fff–2(c)(1). Moreover, courts have uniformly held that persons who are involved with a SIPC member in a lending transaction are not entitled to the special protections afforded customers. *See, e.g., SIPC v. Executive Securities Corp.,* 556 F.2d at 99; *SEC v. F.O. Baroff Co.,* 497 F.2d 280, 284 (2nd Cir.1974); *In re Hanover Square Securities,* 55 B.R. 235, 238 (Bankr.S.D.N.Y.1985). As the Second Circuit Court of Appeals made clear in *Executive Securities,* citing *F.O. Baroff,* "[w]e pointed out that Congress intended to protect the public customer as investor and trader, not...others who

might become creditors of the broker-dealer for independent reasons." *Executive Securities,* 556 F.2d at 99. FBW's motion seeking a court order requiring the trustee to freeze cash, perform an accounting of all cash collateral, and seek court permission to use such cash runs counter to SIPA's intent to protect public customers. Thus, even if FBW could trace $18,000,000 attributable to the stock loan transactions in which it participated with MJK, such funds would, as a matter of law, be set aside for customers not FBW.

Thus, SIPA's safeguards and protections, including a broad application of 15 U.S.C. § 78*lll*(4)(D), act to limit any damage to public customers caused by the debtor, its officers, directors, and employees. FBW's attempt to remove cash in the debtor's accounts from treatment as customer property and to obtain such cash in priority to all customers and other creditors, directly contravenes SIPA and its program to protect the broker-dealer's most important client—its customers.

### ORDER

THEREFORE, IT IS ORDERED that:

1. The plaintiff's motion for partial summary judgment is granted in part.

2. The plaintiff has a claim in this case in the amount of $19,763,631.

3. Except as provided in paragraph two, the plaintiff's motion for partial summary judgment is denied.

4. The defendant's motion for summary judgment is granted.

5. Except as provided above, the plaintiff shall recover nothing from the defendant on its complaint.

LET JUDGMENT BE ENTERED ACCORDINGLY.