### In re NATION–WIDE EXCHANGE SERVICES, INC., Debtor.

Nauni Jo Manty, as Chapter 7 Trustee for the Bankruptcy Estate of Nation–Wide Exchange Services, Inc., Plaintiff,

v.

Miller & Holmes, Inc., Defendant.

Miller & Holmes, Inc., Plaintiff,

v.

Nauni Jo Manty, as Chapter 7 Trustee for the Bankruptcy Estate of Nation–Wide Exchange Services, Inc., Defendant.

Bankruptcy No. 00–31923.
Adversary Nos. 00–3233, 00–3258.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

March 31, 2003.

135

Nauni Jo Manty, Minneapolis, MN, for debtor.

Cass S. Weil, Moss & Barnett PA, Minneapolis, MN, for plaintiff.

## ORDER RE: CROSS–MOTIONS FOR SUMMARY JUDGMENT

GREGORY F. KISHEL, Chief Judge.

These adversary proceedings are before the Court on cross-motions for summary judgment. The Plaintiff appears as Trustee and as counsel for the bankruptcy estate of Debtor Nation–Wide Exchange Services, Inc. Miller & Holmes, Inc. ("M & H") appears by its attorney, Cass S. Weil. Upon the moving and responsive documents and the arguments of counsel, the Court makes this order.

### THE PARTIES

■ The Debtor in the underlying bankruptcy case is one of several business entities based in St. Paul, Minnesota, that were owned by one John Davies. The Debtor was a "Qualified Intermediary" for "like-kind exchange" transactions under 26 U.S.C. § 1031.[1] As such, the Debtor was retained by the owners of business and investment property, to receive the proceeds from the sale of such assets and to hold them until they were reinvested in similar property or were returned to the client. Along with Davies and several of his other business entities, the Debtor filed a voluntary petition under Chapter 7 on April 25, 2000.

The Trustee was appointed and began her administration of the Debtor's bankruptcy estate on April 26, 2000.

M & H is a business corporation that had been a client of the Debtor on a like-kind exchange transaction in 1999–2000.

### SUBJECT OF THIS LITIGATION[2]

Prior to the summer of 1999, M & H conducted business at 501 Lafayette Road, St. Paul, Minnesota. Under threat of condemnation by Ramsey County, M & H agreed to sell that premises to the County for $700,000.00. It then located a parcel of undeveloped land in Hudson, Wisconsin, for a new place of business, and it contracted with a builder to erect a facility on the site.

M & H elected to use a like-kind exchange to defer the recognition of taxable gain that otherwise would have been imposed on its sale to Ramsey County. It retained the Debtor to administer a "deferred exchange." As the arrangement was ultimately performed, M & H was to assign the right to receive the full proceeds of sale to the Debtor. The Debtor received the net proceeds after an escrow company disbursed enough of them to purchase the Hudson real estate. The Debtor then was to hold the net proceeds, paying them to M & H's builder in increments as construction proceeded. The total price for the construction was expected to exceed the amount of the sale proceeds; M & H was to pay the builder for the balance. As intermediary and assignee from M & H, the Debtor was to receive title to the Hudson property, and to retain it until

---

1. This provision of the Internal Revenue Code allows the recognition of taxable gain on a sale or other disposition of certain property used in trade or business to be deferred, 26 U.S.C. § 1031(a)(1), so long as the taxpayer completes an exchange of the transferred property for "property of like kind" within 180 days, 26 U.S.C. § 1031(a)(3). The statutory scheme achieved its current structure in 1984, in response to the ruling in *Starker v. United States*, 602 F.2d 1341 (9th Cir.1979). *See Ravenswood Group v. Fairmont Assoc.*,

736 F.Supp. 1285, 1287–1288 (S.D.N.Y.1990); *C. Bean Lumber Transp., Inc. v. United States*, 68 F.Supp.2d 1055, 1058 (W.D.Ark.1999); Nathanson, "Deferred Like–Kind Exchanges in 20 Easy Steps," 25 *Tax'n for Law.* 86 (1996).

2. This is a recitation of basic historical and transactional facts, all of which are uncontroverted.

the construction was complete "and the property was ready to transfer to" M & H. The original terms of the Debtor's retention by M & H were set forth in two agreements executed on November 1 and 2, 1999.[3]

During the 90 days preceding the Debtor's bankruptcy filing, the Debtor directed the disbursement of the following sums to M & H's builder:

| DATE | AMOUNT |
|---|---|
| 1/31/00 | $ 82,170.00 |
| 3/02/00 | $ 61,343.00 |
| 4/10/00 | $162,914.00 |

After the last such payment, M & H paid further sums to the builder in final settlement of the construction charges. The Debtor's bankruptcy filing came before the last such payment from M & H. M & H has not yet received title to the Hudson property.

## NATURE OF ADVERSARY PROCEEDINGS

The two adversary proceedings at bar have been jointly administered, given their common subject matter.

In ADV 00–3233, the Trustee seeks to avoid the payments of funds that were made to M & H's builder at the direction of the Debtor between January 31 and April 10, 2000, in a total of $306,427.00, as preferential transfers under 11 U.S.C. § 547(b). To effectuate the avoidance, the Trustee seeks a money judgment against M & H pursuant to 11 U.S.C. § 550(a)(1).

In defense of ADV 00–3233, M & H pleaded first that the funds in question remained its own property, directly traceable to it, and that the Debtor "did not have any equitable interest in either the money

it was holding or the real property to which it held title." Thus, as M & H would have it, there was no "transfer of an interest of the [D]ebtor in property" within the meaning of § 547(b), and the Trustee's case fails on this threshold element. It also raises two affirmative defenses under 11 U.S.C. § 547(c): that the transfers were made in the ordinary course of business of all involved parties, within the contemplation of § 547(c)(2), and that the payments were a contemporaneous exchange for new value, within the scope of § 547(c)(1).

In ADV 00–3258, M & H seeks declaratory and equitable relief against the Trustee, as to the Hudson real estate. It requests a determination that the bankruptcy estate holds no more than the bare legal title to the property, with no value inuring in the estate. It also seeks a judgment compelling the Trustee to convey that title to it, essentially via specific performance.

In response, the Trustee maintains that the pendency of her avoidance action is a bar to any affirmative relief to M & H under the November, 1999 agreements. She requests that she not be directed to convey title until the avoidance action is finally adjudicated, and until M & H has satisfied any judgment in favor of the bankruptcy estate.

## MOTIONS AT BAR

Both parties have moved for summary judgment on all of the requests for relief presented in the two adversary proceedings. The governing rule is FED. R. BANKR. P. 7056.[4] As a threshold matter, the mov-

---

**3.** The transactional specifics of the arrangement were modified somewhat, apparently consensually and informally. This did not change the core structure of duties and rights under the agreements.

**4.** This rule makes FED. R. CIV. P. 56 applicable to adversary proceedings in bankruptcy. In pertinent part, FED. R. CIV. P. 56(c) provides that, upon a motion for summary judgment,

ant under this rule must establish that there is "no genuine issue as to any . . . fact that is material to the claims or defenses at issue on the motion." *In re de Jesus,* 268 B.R. 185, 190 (Bankr.D.Minn.2001); *In re Circuit Alliance, Inc.,* 228 B.R. 225, 229–230 (Bankr.D.Minn.1998).[5]

If there is no triable fact issue, the movant then must show its right to judgment under the governing law, upon the uncontested facts gleaned from the record presented on the motion. *Guinness Import Co. v. Mark VII Distributors, Inc.,* 153 F.3d 607, 610–611 (8th Cir.1998); *Osborn v. E.F. Hutton & Co., Inc.,* 853 F.2d 616, 618 (8th Cir.1988). The Eighth Circuit has noted many times that summary judgment is a particularly appropriate means of judicial decision-making where the issues in litigation are "primarily legal rather than factual." *E.g., Gordon v. City of Kansas City,* 241 F.3d 997, 1002 (8th Cir.2001); *Buettner v. Arch Coal Sales Co., Inc.,* 216 F.3d 707, 713 (8th Cir.2000); *United States Fidelity and Guaranty Co. v. Housing Auth. of the City of Poplar Bluff,* 114 F.3d 693, 695 (8th Cir.1997); *Crain v. Board of Police Com'rs,* 920 F.2d 1402, 1405–1406 (8th Cir.1990). *See also State of Minnesota, Dept. of Revenue v. United States,* 184 F.3d 725, 728 (8th Cir. 1999) (where dispute is presented on stipulated or uncontested facts and presents only questions of law, disposition by summary judgment is appropriate).

A movant for summary judgment can proceed from either an affirmative or defensive posture. If seeking relief in the affirmative on either a cause of action or an affirmative defense, the movant must amass the evidentiary fruits of its investigation and discovery effort; must link them to the recognized elements of its claim or defense; and must then demonstrate that the evidence would constitute a prima facie showing on all of the elements. *In re Hauge,* 232 B.R. 141, 144 (Bankr. D.Minn.1999) (summarizing governing precedent). If it does so, it will shift the onus to the respondent. There are several ways to avoid a grant of summary judgment in such circumstances. In one, the respondent may shoulder a responsive burden of proof. That is, it can produce admissible evidence that could support contrary findings of fact on one or more of the elements of the claim or defense. *Mohr v. Dustrol, Inc.,* 306 F.3d 636, 643 (8th Cir.2002); *Kells v. Sinclair Buick–GMC Truck, Inc.,* 210 F.3d 827, 830 (8th Cir.2000). In the alternative, it may concede the facts to the movant, and then convince the court that the governing law actually compels judgment in its favor. *In re Hauge,* 232 B.R. at 145.

Summary judgment may be sought preemptively, to defeat a claim or an affirmative defense. As the rule is most commonly invoked, a movant comes forward to challenge the sufficiency of its opponent's case. It does so by garnering the full fruits of both sides' known investigation and discovery, and then pointing to an apparent and fatal hole—the lack of evi-

---

[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits [submitted in support of the motion], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

**5.** Materiality is governed by the substantive law that applies to the parties' dispute.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the applicable law.

*Hammer v. City of Osage Beach,* 318 F.3d 832, 837 (8th Cir.2003).

dence to support findings on one or more of the essential elements of the respondent's claim or defense, as those elements are identified in the law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This requires a proof-centered inquiry, driven by the nature and quality of the evidence presented on the motion. If the respondent does not shoulder its burden to produce admissible evidence to meet *all* of the elements of its claim or defense, the movant will succeed in its preemptive strike; it will receive a judgment to defeat its opponent's case, without having to go to trial. *Luigino's, Inc. v. Peterson,* 317 F.3d 909, 914 (8th Cir.2003); *TRI, Inc. v. Boise Cascade Office Prods., Inc.,* 315 F.3d 915, 918–919 (8th Cir.2003); *Constr. Management and Inspection, Inc. v. Caprock Communications Corp.,* 301 F.3d 939, 942 (8th Cir. 2002); *Shrum v. Kluck,* 249 F.3d 773, 777 (8th Cir.2001); *St. Jude Medical, Inc. v. Lifecare Internat'l, Inc.,* 250 F.3d 587, 595–596 (8th Cir.2001).

Here, both sides have presented their motions on a tacit assumption that the material facts are acknowledged, and hence uncontroverted. The Court is not bound by the parties' assumption that there are no triable fact issues. *In re Atkins,* 176 B.R. 998, 1002 (Bankr.D.Minn. 1994). However, a request for summary adjudication presented on stipulated facts is proper under the rule. *E.g., State of Minnesota v. United States,* 184 F.3d 725 (8th Cir.1999). As it boiled down here, most of the issues were legal in nature: the legal character and consequence of a sequence of transactions as to which there is no dispute over their occurrence, timing, and form. The most basic findings on those points have already been noted, and others will be made further on. As to other aspects of the parties' respective cases, the allocation of burdens drives a result. In the end, the principles of summary judgment and the governing law enable a summary adjudication of this whole matter.

## DISCUSSION

### I. More Uncontroverted Facts.

In sum, the central facts that go to both sides' legal theories are not controverted.

First, the more specific aspects of the contractual relationship between the Debtor and M & H are as follows:

As noted earlier, on November 1 and 2, 1999, M & H and the Debtor entered into two written agreements that established their relationship, rights and duties in connection with the like-kind exchange.

The first was titled "Phase 1 Delayed Exchange & Assignment Agreement" ("the Phase 1 Agreement"). By its terms, the Phase 1 Agreement provided that:

1. M & H assigned to the Debtor all of its rights in the contract for the sale of the Lafayette Road property to Ramsey County.

2. The Debtor, however, would continue to act as the seller-of-record to Ramsey County for the closing on that sale.

3. At the closing, Ramsey County would transfer to the Debtor the right to the cash proceeds of the sale.

4. It was contemplated that an escrow agent. Commonwealth Land Title Insurance Company ("Commonwealth"), would be involved in the closing, to hold a deed for the Lafayette Road property from the Debtor to Ramsey County until it received the full sale price from Ramsey County, and to use those sale proceeds to make all payments incidental to the closing.

5. After that, the Debtor was to receive and hold the net proceeds of sale, pending M & H's identification of a replacement property and its direction to the Debtor to acquire the property.

6. After the Debtor received "any cash proceeds received from the disposition of" the Lafayette Road property, it was to

 "h[o]ld and invest[ ] [them] in certificates of deposit, cash management, working capital or money market accounts, bankers acceptance or U.S. obligations in [the Debtor's] discretion and through financial institutions of [the Debtor]".

 The Debtor was "not required to maximize return on these cash proceeds, security and liquidity [were to] take precedence." "Interest earned from the deposit of cash proceeds [would] accrue to the benefit of" M & H. The "investment account" for the Debtor's holding of the proceeds was to "be in the name of" the Debtor and to "require the signature of an authorized officer of [the Debtor] to permit the withdrawal of any portion thereof." The Debtor was to be "required to participate in the withdrawal of funds [only] when instructed by [M & H] and only when the instructions involve[d] the acquisition of the Replacement Property or the disposition of said proceeds by [the Debtor] to [M & H] . . ."

7. M & H would enter the contract for purchase of a replacement property, though the agreement contemplated that M & H could assign its rights under that contract to the Debtor if this were necessary to accomplish the tax-deferred exchange.

8. Ultimately, M & H was to receive all right, title, and interest in the re-

placement property, within the time contemplated by the Internal Revenue Code's provisions governing like-kind exchanges.

The second agreement was entitled "Phase 2 Warehousing and/or Construction Improvement Exchange Agreement" ("the Phase 2 Agreement"). This document assumed that the sale of the Lafayette Road property had closed, and recognized that M & H had entered a contract for the purchase of the Hudson property. By its terms, the Phase 2 Agreement provided:

1. M & H assigned to the Debtor all of its rights in the contract for the purchase of the Hudson property.

2. When the purchase closed, the Debtor would receive fee title from the prior owner, "title vesting in [the Debtor] for the purpose of effecting a tax-deferred exchange."

3. The Debtor would then hold the title until "the improvements/construction have been completed and the [Hudson] property [was] ready for transfer to" M & H, at which time the Debtor was to deed the property to M & H.

4. M & H was to "be responsible for all construction of improvements" to the Hudson property.

5. At or after the transfer of title to M & H, "all proceeds received by [the Debtor], with the exception of [the Debtor's] fee, [were to] be tendered to" M & H, with "[s]aid sum represent[ing] funds advanced to the Debtor for the acquisition and construction of the [Hudson] property."

The circumstances of the Debtor's actual performance as intermediary are also not controverted, as matters of fact.

M & H had located the unimproved Hudson property and had contractually committed to purchase it before it closed

on its sale of the Lafayette Road property. Thus, it used Commonwealth to handle a continuing escrow of the proceeds of the Lafayette Road sale, and to disburse part of them to the seller of the Hudson property.[6] The Debtor then took title to the Hudson property. On November 3, 1999, the Debtor received the balance of the proceeds from Commonwealth, in the sum of $548,913.70.

After that, M & H contracted with Derrick Construction ("Derrick") to erect a structure on the Hudson property, under an agreement dated November 11, 1999. Pursuant to the Phase 2 Agreement, M & H nominally assigned its rights in the Derrick contract to the Debtor on November 16, 1999.

At this point, there occurred the complication that led to the downfall of the Debtor and the other entities in Davies's operation.[7] Davies deposited the net proceeds from the Lafayette Road sale into a general account that the Debtor maintained with the Charles Schwab national brokerage. He deposited sale proceeds from like-kind exchanges for the Debtor's other clients into the same account.[8] From there, the Debtor made withdrawals and transfers out of that account, into and through several other accounts that it and Davies's other business entities maintained at the Charles Schwab brokerage and at Norwest Bank, N.A. Among these accounts was an "investment account" through Charles

Schwab, through which Davies made numerous short-term "day trades" in the unsettled stock market of late 1999 and early 2000. These transactions lost a substantial amount of the funds that the Debtor and Davies's other business entities were administering in like-kind exchanges.[9]

The results were two-fold. First, as the Trustee attests from her analysis of the Debtor's books and records, the commingling and inter-entity transfer of clients' sale proceeds made it impossible to trace those attributable to any particular client.[10] Second, the Debtor and Davies's other business concerns began using the receipts from sales of the property of later-secured clients to meet their obligations to disburse for the purchase of replacement properties for earlier-secured clients. It was not long before Davies's entities were unable to meet their obligations on transactions that had to be finalized in the spring of 2000. Davies then decided to place himself and his business entities into bankruptcy.

Pursuant to its contract with M & H, the Debtor issued a number of checks to Derrick. It made two initial payments to bind the construction contract in November, 1999. After that, Derrick periodically submitted progress invoices to the Debtor as it proceeded with the work. Upon M & H's approval, the Debtor paid the invoices. As found earlier, within the 90 days preceding the Debtor's bankruptcy filing, pur-

---

6. Strictly speaking, this channeling of funds did not follow the path specified in the Phase 1 and 2 Agreements; neither did subsequent trackings of the remaining proceeds. The divergence, however, is not material to the disputes at bar.

7. It also led to the bringing of federal criminal charges against Davies, and a subsequent plea, conviction, sentencing, and imprisonment on them.

8. There is no evidence that the Debtor ever established segregated, free-standing, and identified escrow accounts for any of its clients.

9. It is unclear from the record at bar whether Davies was trying to parlay this trading to his personal benefit, or to that of his companies' clients.

10. M & H has not come forward with any evidence to effect a tracing of the proceeds of the Lafayette Road property.

suant to M & H's direction, the Debtor issued checks to Derrick of a total of $306,427.00. Derrick negotiated those checks and issued corresponding mechanic's lien waivers to M & H.

The Debtor did not issue a check on account of the final invoice from Derrick that would have met the total of the net proceeds it had received from the Lafayette Road sale.[11] After Derrick substantially completed the construction on June 1, 2000, M & H made demand on the Trustee that she make this payment. She declined to do so, citing her inability to trace specific funds to M & H's account and her duty to all of the Debtor's other unsatisfied clients.

## II. Application of the Law to the Uncontroverted Facts.

### A. Trustee's case for avoidance of preferential transfers.

▆▆▆▆ The Trustee seeks a judgment against M & H in avoidance of three transfers of money that she deems preferential. The law governing her right to such a recovery is 11 U.S.C. § 547(b).[12] The Trustee has the burden of proof on all the elements of this statute, 11 U.S.C.

§ 547(g), which for the facts presented arguably number seven:

1. the transfer

2. of an interest of the debtor in property,

3. to or for the benefit of a creditor,

4. for or on account of an antecedent debt,

5. made while the debtor is insolvent

6. and within ninety (90) days before the debtor's bankruptcy filing,

7. that enables the creditor to receive more than the creditor would have in a chapter 7 case, had the transfer not been made.

11 U.S.C. § 547(b); *Union Bank v. Wolas,* 502 U.S. 151, 155, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991); *In re Interior Wood Products Co.,* 986 F.2d 228, 230 (8th Cir. 1993); *Lovett v. St. Johnsbury Trucking,* 931 F.2d 494, 497 (8th Cir.1991); *Brown v. First Nat'l Bank of Little Rock,* 748 F.2d 490, 491 (8th Cir.1984); *In re Libby Internat'l, Inc.,* 247 B.R. 463, 466 (8th Cir. BAP 2000).

M & H acknowledges that the Trustee can meet the first, fifth and sixth elements.[13] For this motion, however, it

---

**11.** This was the progress invoice that M & H received on April 21, 2000, for which the Debtor was to make payment of $153,639.72 and M & H was to satisfy the balance. M & H approved the invoice for the contemplated payment on April 24, 2000, and forwarded it to the Debtor. This was the day before the Debtor's bankruptcy filing. M & H ultimately made good to Derrick for the amount that the Debtor was to have paid. As contemplated under the original agreement, M & H continued to make payments to Derrick from its own funds; it came to final terms with the contractor by late November, 2000.

**12.** In pertinent part, this statute provides:

(b) [T]he trustee may avoid any transfer of an interest of the debtor in property—
 (1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the date of the filing of the petition...
. . .
(5) that enables such creditor to receive more than such creditor would receive if—
(A) the case were a case under chapter 7 of [the Bankruptcy Code];
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of [the Bankruptcy Code].

**13.** Given the transfers' proximity to the Debtor's bankruptcy filing—all within the ninety-

maintains that the Trustee cannot satisfy the second, third, and fourth elements on the facts it identifies; that is to say, M & H maintains that the Trustee's preference remedy simply does not meet the transactions at bar, as a matter of law.[14] M & H also argues that a judicially-recognized override of the Trustee's remedy, the "earmarking doctrine," bars a recovery for the Trustee.

### 1. Transfer of Property of Debtor.

M & H's first argument is that the three payments made by the Debtor to Derrick and for M & H's benefit were not transfers "of an interest of the debtor and property," as required by the prefatory language of § 547(b). M & H maintains that the Debtor was "merely a stake holder and not the owner of the sale proceeds." Thus, as M & H would have it, the Debtor was only channeling the funds around in a loop—from the escrow holder of the proceeds of property that M & H owned, back into property that M & H was to own—and no incident of ownership ever reposed in the Debtor.

This argument fails for three reasons.

The first is that for the Debtor to have been legally empowered to hold and direct the payment of funds that remained in the ownership of a third party, it had to have been an agent of that party. The exis-

tence of a true agency relationship, through which a future debtor is holding and applying property of a third party, can defeat a finding on this element of a preference. *In re Rine & Rine Auctioneers, Inc.*, 74 F.3d 848, 851–852 (8th Cir.1996). The existence of the relationship is an issue governed by nonbankruptcy law, however. *Id.* In the case of a contractual relationship the governing rule is the "private law" of the contract's terms. The Phase 1 and 2 Agreements both expressly provide that the Debtor was not to be considered as M & H's agent for the execution of the like-kind exchange.[15]

Second, the law cuts against M & H on a deeper contractual level. The initial commingling of M & H's funds with those of the Debtor's other clients was not expressly forbidden by the terms of the Phase 1 Agreement. Nowhere does either Agreement specify that the Debtor was to hold the proceeds in a segregated form or account. In point of fact, Term 8 gave the Debtor a discretionary power to choose the form in which it was to "h[o]ld and invest" the proceeds—which cuts to the contrary, if anywhere. The lack of specific client instructions to segregate proceeds, and the Debtor's exercise of substantial control over the funds under contractual warrant, mean that the funds became the Debtor's property upon receipt from Common-

day period of § 547(b)(4)(a)—the Trustee has the benefit of the presumption of insolvency under § 547(f). M & H did not try to rebut the presumption.

**14.** M & H does not speak to the seventh element, either in concession or in challenge. This is the so-called "advancement in position" requirement of § 547(b)(5). *See, in general, In re Zachman Homes, Inc.*, 40 B.R. 171, 174 (Bankr.D.Minn.1984). In her submissions, the Trustee makes out a prima facie case that the Debtor's estate is so insolvent that M & H's garnering of the $306,427.00 enabled it to recover more on account of its contractual relationship with the Debtor than

it would have, had it not received the payments and had the Debtor gone into Chapter 7 when it did, with all of its funds on hand including those disbursed to M & H. Because M & H has not challenged the Trustee's proof on this element, more extended discussion is not warranted.

**15.** No doubt, this provision was to prevent the Debtor from constructively receiving any portion of the cash proceeds before it got the value of the Lafayette Road property entirely in-kind, in the form of the improved Hudson property. A receipt of any part of the proceeds in cash would probably be deemed the realization of taxable gain.

wealth. *In re Bellanca Aircraft Corp.*, 96 B.R. 913, 915 (Bankr.D.Minn.1989), cited with approval in *In re Rine & Rine Auctioneers, Inc.*, 74 F.3d at 862.[16]

As a third alternative, one can assume *arguendo* that the Debtor *initially* received a property interest identified to M & H and was charged with holding it, and one would still have to find that the funds actually paid to Derrick were not the property of M & H. Davies's pervasive *de facto* practice of commingling and diverting the sale proceeds that his companies received on account of all of their clients worked a conversion of them all to the use of the Debtor, whether the manipulation was proper or not. As a result, given the context of bankruptcy, the funds must be deemed to have been property of the Debtor when they were disbursed for M & H's benefit.

This result is appropriate despite the holdings by some courts that property that is stolen by a future or present debtor in bankruptcy, or otherwise obtained by the fraud of that debtor, does not become property of the bankruptcy estate, and is deemed to be held in trust for the wronged party. *E.g., In re Flight Transportation Corp. Securities Litigation*, 730 F.2d 1128, 1136 (8th Cir.1984); *In re Teltronics, Ltd.*, 649 F.2d 1236, 1239 (7th Cir.1981); *In re Montross*, 209 B.R. 943, 950 (9th Cir. BAP 1997); *In re Dynamic Technologies Corp.*, 106 B.R. 994, 1005 (Bankr.D.Minn.1989); *In re A.E.F.S., Inc.*, 51 B.R. 340, 343–344 (Bankr.D.Minn.1985). Phrased as broadly as that, the precept satisfies a gut-level sense of justice.

However, outside a limited factual context, its application would cause great mischief to the broader goals of bankruptcy law, which include the equal treatment of similarly-situated claimants and a prioritized and ratable distribution. The principle most defensibly lies where the wronged party has a distinctive claim to the asset, or has a special situation in the debtor's business operations, *and* where the converted property is defined, discrete, and capable of tracing. These circumstances may be sufficient to merit the imposition of a constructive trust, *see In re MJK Clearing, Inc.*, 286 B.R. 109, 126 (Bankr.D.Minn.2002), which is the situation where the Eighth Circuit envisioned the principle as operating. *In re Flight Transportation Corp. Securities Litigation*, 730 F.2d at 1136. In that setting, it is far more likely that the wronged party could retrieve the property without damage to the values underlying bankruptcy law. *Cf. In re MJK Clearing, Inc.*, 286 B.R. at 128–129 (because post-petition imposition of constructive trust against funds in bankruptcy estate would disrupt Bankruptcy Code's distribution priorities, it should be done only in cases of "egregious" circumstances). The remedies of constructive trust, sequestration, and the like cannot be applied, however, where the subject *res* cannot be traced or presently identified, and the interests of numerous other similarly-situated claimants are implicated. *In re MJK Clearing, Inc.*, 286 B.R. at 126; *In re Dartco, Inc.*, 197 B.R. 860, 868–869 (Bankr.D.Minn.1996). *See, in general, In re Independent Clearing House Co.*, 41 B.R. 985, 998–1005 (Bankr.D.Utah 1984).

Where, as here, the party engaged with the debtor in a form of transaction identical to that of numerous other clients; the

---

**16.** A trusting exchanger might assume that its sale proceeds would be segregated in some way, and the assumption is not entirely unreasonable. Unfortunately, under the Internal Revenue Code and Internal Revenue Service regulations, the incidents of this aspect of qualified intermediaries' operation are unregulated. It literally is a matter of *caveat* exchanger.

transactions were executed with the same type of property and in the same manner; and the debtor's commingling and manipulation left the fate of the party's specific funds as indeterminate as those of any other client, the broad precept just does not fit. *In re Foster*, 275 F.3d 924, 927 (10th Cir.2001) (courts should not use judicial tracing fiction from constructive trust remedy where wrongdoer commingled funds from other clients as part of general fraudulent practice). Even were there not a basis in contract to deem the received proceeds the property of the Debtor, Davies's practices of post-receipt commingling and conversion made them so.

Therefore, as a matter of law, the Trustee has proved up the second element of § 547(b) on the uncontroverted facts. Her case for avoidance will not fail on this point.

### 2. Application to Antecedent Debt; M & H's Status as a Creditor.

M & H next argues that, regardless of the status of the subject funds, they were not paid on account of an antecedent debt as § 547(b)(2) requires. The factual and legal basis for this argument is virtually coeval with M & H's third argument—that it was not a "creditor" of the Debtor at the time of the transfers.

The Bankruptcy Code defines "debt" and "claim" in coextensive terms. *United States v. Gerth*, 991 F.2d 1428, 1433 (8th Cir.1993). "Debt" is defined as "liability on a claim." 11 U.S.C. § 101(12). In turn, "claim" is defined, in the part pertinent to this matter, as

...right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured...

11 U.S.C. § 101(5)(A). The definition of "creditor" further interlocks: "an entity that has a claim against a debtor that arose at the time of or before the order for relief [in bankruptcy] concerning the debtor." 11 U.S.C. § 101(10).

The crux of M & H's argument on these two points comes from the sequence through which the Debtor's duty of payment ripened:

M & H had no claim against the Debtor so long as the Debtor fulfilled its obligations pursuant to the [Phase 1 and 2] Agreements. At the time the payments here...were made, ... M & H was not a creditor of the Debtor because M & H had no claim against the Debtor. The Debtor had no obligation to pay over funds to Derrick pursuant to the Agreements until those payments were due. The payments were not due...until Derrick completed the work and submitted [a progress invoice] to M & H.

This argument is flawed at its very base. It ignores the Bankruptcy Code's definition of "claim," the "broadest available" to Congress. *Johnson v. Home State Bank*, 501 U.S. 78, 83, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991). Under § 101(5)(A), it does not matter if a right to payment is "liquidated, unliquidated, fixed, contingent, matured, [or] unmatured."

Under the Phase 2 Agreement, M & H's right to compel the Debtor to make payment to it or for its benefit did not mature until value was infused into the Hudson property by Derrick's work, in increments or otherwise, and at the end of the period for making a like-kind exchange at latest. Nonetheless, a status as unmatured did not prevent its right to payment from being a "claim." *In re Pardee*, 218 B.R. 916, 921 (9th Cir. BAP 1998); *In re Dixon*, 218 B.R. 150, 152 (10th Cir. BAP 1998); *In re Edge*, 60 B.R. 690, 692–693 (Bankr. M.D.Tenn.1986). That right was defined by the terms of the Phase 1 Agreement; it

vested when the Debtor received the net proceeds of the Lafayette Road property. At the very least, M & H had the right to compel the Debtor to turn over any unapplied portion of the net proceeds to it at the end of the period for effecting the like-kind exchange under applicable income tax law, up to the full sum if a replacement property was not located. The residual right to receive it all back, though contingent and unmatured, made any part of Derrick's performance irrelevant to M & H's status as the holder of a claim under bankruptcy law. *Cf. In re Minn. Utility Contracting, Inc.,* 101 B.R. 72, 81 n. 6 (Bankr.D.Minn.1989) ("Debts are incurred upon the performance giving rise to the debt, not when payment is due...").

In this light, M & H's argument against a status as "creditor" is even less tenable. As soon as the Debtor received the net proceeds, M & H held a substantial claim against the Debtor. As a right to receive payment in cash, the claim was concurrently reduced as Derrick negotiated the checks that the Debtor had issued to it, and as Derrick issued corresponding lien waivers. However, a significant portion of the claim-over $150,000.00—remained unsatisfied when the Debtor filed for bankruptcy. At all times relevant to the Trustee's cause of action for avoidance, M & H was a creditor of the Debtor.

Thus, contrary to M & H's argument, the Trustee does not lack the predicates for the third and fourth elements of § 547(b).

*3. Availability of Earmarking Defense.*

■ M & H's fourth attack on the Trustee's cause of action uses the "earmarking" doctrine, applied by the Eighth Circuit since at least 1988. *See In re Bohlen Ents., Ltd.,* 859 F.2d 561, 565–567 (8th Cir.1988).[17] The courts articulated this doctrine out of the threshold requirement for a preference, that there have been a "transfer of an interest of the debtor in property." *In re Bohlen Ents., Ltd.,* 859 F.2d at 565. It applies in the situation where a debtor has agreed with a prospective creditor that it will use an advance of funds to pay a specific preexisting debt, usually to another creditor; the parties then perform that agreement within the applicable period under § 547(b)(4); and the transaction as a whole "does not result in any diminution of the estate." *In re Bohlen Ents., Ltd.,* 859 F.2d at 566. *See also In re Muncrief,* 900 F.2d 1220, 1224 n. 4 (8th Cir.1990).

■ As a technical matter, the formulation of the third element in *Bohlen Ents,* is a little confusing.[18] It might be

---

**17.** *Brown v. First Nat'l Bank of Little Rock,* 748 F.2d 490 (8th Cir.1984), is cited in most of the earmarking decisions that came after it, and does treat the issue of what constitutes "property of the debtor" when the funding for a payment attacked as preferential came from a third party. In *Brown,* however, the third party was a co-maker on the debtor's obligation, there is no mention of the creation of a new debt, and the reference to the earmarking doctrine is only *dictum* in a footnote. 748 F.2d at 492 n. 6. *See also In re Bruening,* 113 F.3d 838, 842 (8th Cir.1997).

**18.** It is so because the reference to "the estate" is not really precise. The wording suggests that the subject transfer affects an existing bankruptcy estate. However, the preference remedy, and hence the earmarking doctrine, lie only as to *prepetition* transfers; the bankruptcy estate does not come into existence until the commencement of the bankruptcy case. 11 U.S.C. § 541(a). The better way to conceptualize it is whether the transfer would have resulted in the estate being smaller upon its creation by operation of law, had all other relevant factors been present and all other relevant events occurred as they did, up to the bankruptcy filing. Though this phraseology is cumbersome, and not as immediately evocative as an unadorned reference to "the estate," it at least avoids the use of an element that is

better understood as a requirement that the transfer leave the debtor's asset structure in parity with the state it was in before the transaction. *Begier v. Internal Revenue Service,* 496 U.S. 53, 54, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990) ("... 'property of the debtor' subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings..."); *Brown v. First Nat'l Bank of Little Rock,* 748 F.2d at 491 (payment on debtor's obligation by comakers on note did not come from property of debtor that would have passed into estate, so "there was no preferential transfer"). The transaction must truly be a substitution of one creditor for another. *In re Heitkamp,* 137 F.3d 1087, 1089 (8th Cir. 1998); *In re Interior Wood Prods. Co.,* 986 F.2d at 231. The doctrine "applies only if the new and old creditor[s] enjoy the same priority." *In re Calvert,* 227 B.R. 153 (8th Cir. BAP 1998) (citing *In re Heitkamp,* 137 F.3d at 1089).

■■■ It has been said in passing that the trustee bears the burden of proof on the earmarking issue. *In re Heitkamp,* 137 F.3d at 1089; *In re Calvert,* 227 B.R. at 157. Taken at its face value, this statement is not fully tenable as a matter of logic. It essentially requires the proponent of a case in chief to prove a compounded negative—that is, to frame up what would be necessary to defeat an element of its own cause of action, by way of a transactional structure and sequence, and then to "prove" that it had not been so in reality. Trustees usually inherit the "damaged goods" of failed business operations that had been in long-term disarray, and incomplete books and records filled with omissions and errors. *In re Northgate Computer Systs., Inc.,* 240 B.R. 328,

technically impossible under the governing

368 n. 64 (Bankr.D.Minn.1999). It is neither fair nor realistic to impose the burden of constructing a straw man and then dispatching him, as part of a trustee's prima facie case.

The fairer formulation would give the initial burden on the issue to the preference defendant. It would not be a heavy one. The proponent would first come forward to plead the earmarking defense; then it would prove up the simple structure and sequence of transactions as identified in the cases. Going as it would to one of the Trustee's essential elements, this would be sufficient to defeat the case for avoidance if unrebutted. The burden enunciated in *Heitkamp* would then activate: to prove that the earmarking doctrine does not apply. 137 F.3d at 1089.

In the context of a motion for summary judgment, establishing the transactional prerequisites for an earmarking would fulfill the defendant-movant's option of "pointing out" that the trustee-respondent lacks an essential element of its case. The trustee-respondent then would have to produce evidence that the transactions had not been structured thus, or show that they did not legally equate to a "pass-through" of debt-components in the debtor's fiscal makeup.

■■■ Under the allocation of burdens thus articulated, M & H has failed to meet its initial one. The structure of duties and rights, debts and assets, that changed as the Debtor proceeded with the like-kind exchange simply does not match to the pass-through of debt burdens, like for like, that the earmarking doctrine presupposes.

As the heart of its argument, M & H would factor the ongoing accrual and partial satisfaction of construction-related

law.

debt to Derrick into the earmarking analysis:

Since...Derrick would have retained a mechanic's lien interest equal in value to the amount of each of the payments to which it became entitled had the payments not been made, the estate's value remained the same after each payment. The value of the cash held by [the] Debtor decreased but the value of the [Hudson p]roperty increased by the same amount.

There are several different reasons why this theory does not fly under the earmarking doctrine.

M & H sees the obligations to Derrick as playing a central role in an earmarking. However, it cannot point to any debt from the Debtor to Derrick that was still owing as of the date of the Debtor's bankruptcy filing, that was commensurate to the amount of the Debtor's payments and of the same character under the Bankruptcy Code's classification of claims.

M & H never really identifies a debt from the Debtor to any other party, still enforceable as of the Debtor's bankruptcy filing, that alternatively could fill the bill for a pass-through. The Debtor's duty back to M & H under the Phase 2 Agreement certainly cannot do so, not the least because this would seriously undercut the theory of M & H's bid for specific performance against the Trustee.[19]

In the last instance, however, the most telling flaw in M & H's argument lies in the simple functional aspect of the earmarking doctrine. The estate, as it was ultimately constituted on creation, was indeed diminished by the sequence of transactions here; funds in the Debtor's possession, over which it exercised *de facto* control, and which are now deemed to have been its property, passed out of its possession and into a real property asset as to which the Debtor was always a mere stakeholder. The Phase 1 and 2 Agreements never contemplated the Debtor as claiming the Hudson property as an asset of its own. Derrick's improvement of the premises enhanced the value of the real estate. In corresponding measure, the Debtor's payments to Derrick shifted the benefit of that enhancement over to M & H. Under the Agreements, the paydown of the debt to Derrick could never lie to the Debtor's benefit, other than as a *reduction* of its ultimate duty to turn over the unapplied cash proceeds to M & H. If anything, that last aspect lies entirely to the opposite of a like-for-like pass-through of debt.

The corollary was that value was passing out of the Debtor's possession and control, and into an asset which it would be contractually obligated to convey to M & H, without reservation or qualification, upon Derrick's completion of the improvements.

Cases like this involve what could be termed "resulting Ponzi schemes," or "Ponzi schemes by performance."[20] Some

---

19. M & H correctly points to the fact that it has fully performed all of its duties under the Phase 2 Agreement, by transferring the sale proceeds to the Debtor, locating replacement real estate, and seeing that it was improved to a value that more than matched the amount of the sale proceeds. Thus, it says, the Debtor had only one duty: to deed over the Hudson property. This is a right to an *in rem* satisfaction, via the receipt of unique real estate. Having nothing to do with a "right to pay-

ment," it is not a "claim" in bankruptcy terms, and hence is not matchable to a "debt" by the Debtor.

20. A Ponzi scheme is generally understood as a multi-client investment arrangement executed over time, in which initial investors' infusions are wrongly siphoned off, the fund never maintains enough cash to meet all of its obligations, and the early clients' realization on investment is funded by later clients' infusions. *In re Independent Clearing House*, 41

of the creditor-parties that deal with such small debtors during the term of their wrongdoing manage to get out before the downfall, with little or no loss; others get caught in the lurch. Were bankruptcy not to intervene, the results might be "devil take the hindmost." The regimen of bankruptcy law, however, requires the administrator of the estate to give equal due to all of the Debtor's clients that were harmed by Davies's wrongdoing.[21] Against that backdrop, there is no question that the estate-to-be was substantially reduced by the payments that the Debtor made to Derrick for M & H's benefit. There simply was no earmarking here.

### 4. Conclusion, on Trustee's Case.

The Trustee's prima facie case for avoidance withstands M & H's challenge; there is no genuine issue of material fact as to the existence of all of the elements of § 547(b), and they all lie in her favor. M & H's motion for summary judgment must be denied to that extent, and the Trustee's motion correspondingly granted.

### B. M & H's Affirmative Defenses.

In the alternative, M & H raises two statutory affirmative defenses, and argues that one or both of them bar the Trustee's recovery. The defenses sound under 11 U.S.C. § 547(c). As proponent, M & H bears the burden of proof on both. 11 U.S.C. § 547(g); *In re U.S.A. Inns of Eureka Springs, Ark., Inc.*, 9 F.3d 680, 682 (8th Cir.1993); *In re Gateway Pacific Corp.*, 153 F.3d 915, 917–918 (8th Cir. 1998); *In re Ewald Bros., Inc.*, 45 B.R. 52, 56 (Bankr.D.Minn.1984). In the context of its own motion for summary judgment, to merit a grant of judgment in its favor on the Trustee's cause of action M & H had to produce sufficient evidence to make out all of the elements of one defense or the other, without contradictory evidence from the Trustee.

### 1. Contemporaneous Exchange for New Value.

M & H first raises the "contemporaneous exchange for new value" defense of 11 U.S.C. § 547(c)(1).[22] In sim-

---

B.R. at 994 n. 12 and at 998–1005 (discussing *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924), and its backdrop in the exploits of Charles Ponzi, engineer of investment schemes that were fraudulent in the inception). There is nothing to suggest that Davies set up the Debtor or his other like-kind exchange intermediary-entities with the intent *ab initio* to carry on such a shell game. However, once he mismanaged and converted the funds of some clients, and kept taking in the business and assets of others, it quickly became that.

**21.** Because that regimen includes the "leveling" remedy of avoidance of preferences, *In re Begier v. I.R.S.*, 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990), the Trustee is not out of bounds in invoking it against a party situated like M & H. The simple timing of the Debtor's downfall left M & H with more of a whole skin than were the Debtors' later-secured clients. Understandably, M & H is horrified by the prospect of losing some

more, for the benefit of strangers. That, however, is an unavoidable result of value judgments Congress made long ago, in setting up our bankruptcy system. The Supreme Court recognized this nearly eight decades ago, in *Cunningham v. Brown*. *See* 265 U.S. at 13, 44 S.Ct. 424. *See also In re M & L Bus. Machine Co., Inc.*, 84 F.3d 1330 (10th Cir.1996), *In re Hedged–Investments Assoc.*, 48 F.3d 470 (10th Cir.1995), and *In re Bullion Reserve of N. Am.*, 836 F.2d 1214 (9th Cir.1988) (all allowing avoidance of preferential transfers to client-victims of Ponzi schemes) and, more particularly, *In re San Diego Realty Exchange, Inc.*, 132 B.R. 424 (Bankr.S.D.Cal.1991) (doing same, in case of failed like-kind-exchange intermediary).

**22.** (c) The Trustee may not avoid under [§ 547] a transfer—

(1) to the extent that such transfer was—
(A) intended by the debtor and the creditor to or for whose benefit such transfer

plest terms, a defendant makes its case under this provision by proving that the debtor received new value in exchange for the payment in question, and that both debtor and creditor intended such an exchange. *In re Gateway Pacific Corp.*, 153 F.3d at 918; *In re Lewellyn & Co., Inc.*, 929 F.2d 424, 427 (8th Cir.1991); *In re Stewart*, 282 B.R. 871, 874 (8th Cir. BAP 2002). In pertinent part, new value is defined as "money or money's worth in goods, services, or new credit..." 11 U.S.C. § 547(a)(2). New value may be furnished to a debtor by a third party, as part of a tripartite arrangement. *In re Jones Truck Lines, Inc.*, 130 F.3d at 327. The purpose of this defense is to encourage creditors to continue to deal with financially-distressed debtors, as long as their transactions involve true exchanges of equally-valued consideration. *In re Jones Truck Lines, Inc.*, 130 F.3d at 326. "Other creditors are not adversely affected by such an exchange because the debtor[ ]...has received new value." *In re Dorholt, Inc.*, 224 F.3d 871, 873 (8th Cir. 2000).

 M & H posits Derrick's issuance of lien waivers as the new value received by the Debtor in consideration for the payments made to Derrick for M & H's benefit. This theory fails on the analysis of benefit noted in the treatment of the earmarking defense. The flow of value and benefit here was nowhere analogous to the archetypal situation that triggers the new value defense, a delivery of new goods

or other advance of unsecured credit made in consideration for the paydown of a past-due account. In that situation, the debtor gains something, the wherewithal to continue business operations that it did not have before.

Here, however, all of the outflow from the Debtor's liquid resources went into an asset contractually chargeable to its client, to the full extent of that asset's growing value. The Debtor did not receive a bit of substitute value that it could have controlled or directed for its own purposes. The only effect on the Debtor's solvency was a reduction of its contingent monetary liability to M & H for the full administration of the net proceeds. The outflow, however, did not leave the Debtor any better-put to meet all of its other client obligations; in fact, it left the estate less solvent upon its ultimate creation. The Debtor's final obligation of performance, to convey a fully-improved Hudson property to M & H, remained a constant throughout.

M & H has argued no theory on the new value defense more refined than that. On the undisputed facts that it presents, its defense under § 547(c)(1) fails as a matter of law.

### 2. Ordinary Course of Business.

 M & H then raises the ordinary course of business defense of 11 U.S.C. § 547(c)(2).[23] The Eighth Circuit has observed that this defense requires the

---

was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange...

**23.** This statute provides as follows:

(c) The trustee may not avoid under this section a transfer—

...(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to the ordinary business terms...

Court to "engage in a peculiarly factual analysis." *Lovett v. St. Johnsbury Trucking,* 931 F.2d 494, 497 (8th Cir.1991) (interior quotation marks omitted). "The purpose of this section is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the slide into bankruptcy." S. REP. No. 989, 95th Cong., 2d Sess. 88 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5874; *In re Spirit Holding Co.,* 153 F.3d 902, 904 (8th Cir.1998).

■ The statute sets forth three elements:

1. The debt in question was incurred "in the ordinary course of business of the debtor and the transferee."

2. The debtor made the transfer-payment in the ordinary course of business or financial relations of the debtor and the transferee.

3. The payment was made according to ordinary business terms, that is, that it conformed with "prevailing practice among similarly situated members of the [creditor's] industry facing the same or similar problems."

*In re U.S.A. Inns of Eureka Springs, Ark., Inc.,* 9 F.3d at 682 and 684. *See also In re Gateway Pacific Corp.,* 153 F.3d at 917. The reference point for the first two elements, then, is the past course of dealings between the Debtor and the Defendant. *In re Spirit Holding Co., Inc.,* 153 F.3d at 904; *Lovett v. St. Johnsbury Trucking,* 931 F.2d at 497 (focus is on consistency between transfer at issue and past transactions between debtor and defendant). For the third element, it is "the practice in which firms similar in some general way to the [Defendant]...engage." *In re U.S.A. Inns of Eureka Springs, Ark., Inc.,* 9 F.3d at 685.

Again, M & H has the burden of proof on the facts to make out the statutory elements. *In re Gateway Pacific Corp.,* 153 F.3d at 917. As before, for its motion M & H relies on the undisputed history of the parties' transactions for the factual foundation of this defense—and only that.

■ Due to the very nature of the whole transaction, the defense fails on the first element. To be sure, the Debtor incurred its obligations to make payment to Derrick for the benefit of M & H as part of a like-kind exchange, the sort of transaction that it existed to administer; there is no dispute that the terms and circumstances were within the range of "ordinariness" within the intermediary industry. However, as to M & H, the overall debt was anything but ordinary-course. M & H had liquidated a major capital asset under threat of taking by eminent domain, and was reinvesting it into a new form situated some thirty miles away, across state lines. This is not the sort of thing a business engages in routinely. There is no evidence that M & H did so routinely.

The second element is problematic in a different way; it raises the question of just how applicable the ordinary-course defense is to a one-time contractual relationship between a debtor and a preference defendant. Section 547(c)(2)(B) arguably requires the identification of a "baseline" of payment history between debtor and defendant that spans a length of time and includes a significant number of transactions. *In re Hancock–Nelson Mercantile Co., Inc.,* 122 B.R. 1006, 1011 (Bankr. D.Minn.1991). *Cf. In re Gateway Pacific Corp.,* 153 F.3d at 917 (endorsing bankruptcy court's reference to payments over period of nine months preceding subject transfers, for analysis under § 547(c)(2)(B)). Between these parties,

there really was not enough experience to establish such a yardstick. If anything, this short-term, initial experience between them was the sort of thing to *establish* one, rather than the thing to measure against it.

If one sets aside that reservation, though, and looks at the mere characteristics of payment, there was nothing out of the ordinary in the pattern of frequency, amount, promptness of disbursement, adequacy of payment amount measured against § 547(c)(2)(B). In cutting the three checks to Derrick, the Debtor behaved exactly as M & H expected it to, from the groundwork of the Phase 2 Agreement and the few initial disbursements made before the commencement of the 90–day preference period.

In the last instance, though, the failure of the first element makes the second one academic. So does M & H's lack of proof on the third element, which requires a showing of conformity with industry practices. M & H did not produce any evidence to establish a standard custom and usage for exchangers involved with like-kind-exchange intermediaries at all. Hence, it failed to prove that the circumstances surrounding these disbursements conformed to such a standard.[24]

The only evidence of record is circumstantial and not expressly directed to this element; it goes to the means by which the Debtor was funding payment and as such tends to cut entirely to the opposite finding.[25] Responsible practice for a like-kind-exchange intermediary may or may not require a segregated escrow of individual clients' funds—there is simply nothing in the record on the issue—but at bare minimum an intermediary should maintain a balance of working funds sufficient to meet all of its clients' rights to payment at any given time. *Cf. In re Rine & Rine Auctioneers, Inc.*, 74 F.3d at 852 (if "professional agent" is "properly mingl[ing]" its principals' funds, it is under agreement "to maintain enough in the fund to pay the principal, who has a charge upon the fund to the amount of the debt"). The Debtor was not doing that at all, to the severe prejudice of many, and that point needs no elaboration.[26]

The record that M & H presented cannot support a defense under § 547(c)(2), as a matter of law. The Trustee is entitled to judgment to that effect.

### C. M & H's Proceeding for Specific Performance.

 In ADV 00–3258, M & H seeks a judgment against the Trustee that is es-

---

**24.** The alignment of the parties and the nature of their contractual relationship suggest the limitations of an industry-practices standard that is oriented solely to the defendant-creditor. The orientation makes every bit of sense when the defendant's business requires it to issue large amounts of revolving trade credit. It is confusing if it must be applied to multiple payments made for a substantial sale-and-reinvestment on a major capital asset. Such a transaction is clearly not "in the ordinary course" in a broad sense, but nonetheless it is not excluded from the facial ambit of the cases' articulation of this element.

**25.** Attention to this aspect of the Debtor's performance as an intermediary goes beyond the narrow characteristics of its responsiveness to M & H's immediate needs that were relevant to the second element. It is appropriate to do so, because the Debtor's patent failure to follow responsible cash management standards led to so much injury for so many clients not yet made whole. Cognizance of the collective nature of bankruptcy relief virtually compels the expansion of the focus as to this element.

**26.** M & H was a trusting exchanger. It is painful to observe this in hindsight, but greater prudence would have dictated inquiry into the Debtor's fund- and account-management practices, and the negotiation of specific terms of deposit and escrow.

sentially one for specific performance. It relies on the undisputed facts that it complied with all of its obligations under the Phase 2 Agreement, and that Derrick certified in June, 2000, that the improvements to the Hudson property were substantially completed. Now, it maintains, the Trustee, as successor to the Debtor, has an unqualified duty to convey the Hudson property to it.

The Trustee does not deny that M & H has fully discharged the duties imposed on it on the face of the relevant contracts. Nonetheless, she refused M & H's earlier demands that she tender a deed, and she insists now that M & H cannot legally compel her to give one. Her position throughout—expressed summarily, and unsupported by citation to statute, rule, or case law—is that she should not be compelled to do so until M & H has satisfied any money judgment in avoidance of preferential transfers that she may receive on behalf of the estate.

The issue is an odd one, unprecedented in the experience of the undersigned. Resolving it requires reference to some of the more basic principles of bankruptcy law. That analysis shows the Trustee to be quite unfounded, and M & H to be entitled to the relief it requests immediately.

The bankruptcy estate succeeded to the Debtor's position under the Phase 2 Agreement. As things stood when this litigation was commenced, M & H had fully performed all of its duties under the Agreement, and it only remained for the bankruptcy estate to perform its duties. The Phase 2 Agreement was no longer an executory contract within the scope of 11 U.S.C. § 365. *In re Texscan Corp.*, 976 F.2d 1269, 1272 (9th Cir.1992); *Lubrizol Ents. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1045 (4th Cir.1985); *In re Oxford Royal Mushroom Prods., Inc.*, 45 B.R. 792, 794 (Bankr.E.D.Pa.1985); *In re Braley*, 39 B.R. 133, 135 (Bankr.D.Vt.1984) (all holding that executory contract under § 365 is one in which some material aspect of performance is still due from *both* sides, such that a failure of either to complete performance would constitute a breach sufficient to excuse the other from performing).

As a result, neither the Trustee nor M & H had a contract to contend with in the context of bankruptcy. The Trustee could not reject the Phase 2 Agreement under 11 U.S.C. § 365(a), keeping the Hudson property for liquidation and relegating M & H to an unsecured claim allowable under 11 U.S.C. § 502(g). Much to the contrary, the Trustee held a very thin legal right in the Hudson property—bare legal title— and this right was severely and inescapably limited by M & H's enforceable expectations under the Phase 2 Agreement. *In re Schauer*, 835 F.2d 1222, 1225 (8th Cir. 1987) (property of debtor passes into bankruptcy estate subject to all limitations on it applicable prepetition under contract and law, and trustee is bound by those limitations). *See also In re N.S. Garrott & Sons*, 772 F.2d 462, 465–466 (8th Cir.1985) (broad scope of estate under 11 U.S.C. § 541(a) does not operate to expand substantive rights in property of estate beyond those existing under nonbankruptcy law before bankruptcy filing). The general statutory grant to trustees, of administrative power over property of the estate, does not override the characteristics of that property under nonbankruptcy law, or supplant any limitations on its disposition that applied to it pre-petition.[27] *In re Schauer*, 835 F.2d at 1225–1226.

**27.** The Trustee may have been unconsciously analogizing to 11 U.S.C. § 502(d), which provides for the disallowance of a claim against the estate held by any creditor that is subject

There was, and literally is, nothing for the Trustee to do but perform the Debtor's duty: execute a deed to M & H, transferring full record title to it. M & H is entitled to a judgment to that effect, as a matter of law.

### ORDER FOR JUDGMENT

On the foregoing memorandum of decision,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. Between January 31, 2000, and April 10, 2000, Miller & Holmes, Inc., received the benefit of transfers by the Debtor of funds of a total of $306,427.00, which were preferential within the meaning of 11 U.S.C. § 547(b).

2. Pursuant to 11 U.S.C. § 547(b), the transfers identified in Term 1, in the total of $306,427.00, are avoided.

3. Pursuant to 11 U.S.C. § 551, the avoided transfers are preserved for the benefit of the bankruptcy estate of the Debtor.

4. To effectuate the avoidance of the transfers pursuant to 11 U.S.C. § 550(a), Trustee Nauni Jo Manty shall recover the sum of $306,427.00 from Miller & Holmes, Inc.

5. No later than April 10, 2003, Trustee Nauni Jo Manty shall execute a deed, naming Miller & Holmes, Inc., as grantee, to the following described real estate:

Lot 16, St. Croix Business Park, City of Hudson,
St. Croix County, Wisconsin,

and shall tender it forthwith to Miller & Holmes, Inc.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

to an unsatisfied judgment in favor of the estate under the various Code provisions for the avoidance of transfers or liens. The Code lacks a provision giving the estate such leverage in the very different situation at bar. The analogy is entirely inapposite.