**EVELYN I. RECHTZIGEL TRUST, by its Trustees Frank RECHTZIGEL and Gene Rechtzigel, Appellant,**

v.

**FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK, Respondent,**

**Pulte Title Agency of Minnesota, LLC, Respondent.**

No. A07–0645.

Court of Appeals of Minnesota.

May 6, 2008.

Erick G. Kaardal, Mohrman & Kaardal, P.A., Minneapolis, MN, for appellant.

Ryan R. Dreyer, Eric Nasstrom, Morrison Fenske & Sund, P.A., Minnetonka, MN, for respondent Fidelity National Title.

Charles W. Arndt, Kyle J. Hegna, Wilkerson & Hegna, P.L.L.P., Edina, MN, for respondent Pulte Title Agency.

Considered and decided by MINGE, Presiding Judge; KALITOWSKI, Judge; and CONNOLLY, Judge.

## OPINION

MINGE, Judge.

Appellant purchaser of real property challenges summary judgment dismissal of its claims that respondent title insurer and respondent title insurance agency (1) were liable to cover damages arising out of a preference claim by a bankruptcy trustee; (2) had a duty to defend against that claim; (3) breached their contract; and (4) made negligent misrepresentations. Because we conclude that the district court did not err, we affirm.

## FACTS

On February 15, 2000, appellant Evelyn I. Rechtzigel Trust (Rechtzigel) agreed to transfer property in Apple Valley to Pulte Homes Minnesota Corporation (Pulte Homes). In return, Rechtzigel was to receive farmland in Jackson County owned by yet other persons. The transaction was structured as a "like-kind" land exchange pursuant to 26 U.S.C. § 1031 (2000) (1031 exchange). To the extent there is a qualified 1031 exchange, Rechtzigel as a seller does not have to recognize gain on the sale of its land.

Rechtzigel contracted with Like–Kind Exchange Services (Like–Kind), a qualified intermediary for 1031 exchanges, to handle the transaction. In accordance with the contract, Rechtzigel deeded the Apple Valley property to Like–Kind, which in turn deeded the property to Pulte Homes. Pulte Homes paid over $600,000 to Like–Kind. On February 15, 2000, Like–Kind transferred that money to respondent Pulte Title Agency of Minnesota, LLC (Pulte Title), to be paid to the owners of the farmland at closing. At the closing on March 8, 2000, the owners of the Jackson County farmland delivered a deed transferring the farmland directly to Rechtzigel, and Pulte Title distributed the funds to the Jackson County sellers.

Rechtzigel purchased title insurance for the farmland. That insurance policy was issued by respondent Fidelity National Title Insurance Company of New York (Fidelity). In addition to acting as a closing

agent for the transaction, Pulte Title was the insurance agent that issued the binder and sold the title insurance. The insurance had an effective date of March 8, 2000. In the binder, Pulte Title represented to Rechtzigel that it would be issued an ALTA Residential Owner's Policy—1987 (1987 policy). However, the actual policy issued was an ALTA Owner's Policy—1992 (1992 policy).

Unbeknownst to the other parties at the time of this 1031 exchange, Like–Kind was engaged in financially risky practices. It deposited the over $600,000 that it received from Pulte Homes in a common account, and the commingled funds were apparently used to cover Like–Kind's obligations in earlier transactions. Similarly, Like–Kind's obligations in this transaction were at least partially paid with funds from other, not-yet-completed transactions. Shortly after closing, Like–Kind's financing arrangement collapsed, and it filed bankruptcy on April 25, 2000. Although all matters related to the Rechtzigel/Pulte Homes/Jackson County farmland transaction had been completed prior to the bankruptcy filing, the bankruptcy trustee contacted Rechtzigel, demanding that Rechtzigel restore to the bankruptcy estate the sum of $602,424.76, representing the funds that had been deposited with and disbursed by Like–Kind on behalf of Rechtzigel. Because Rechtzigel's transaction closed on March 8, 2000, less than 90 days before the bankruptcy, the bankruptcy trustee initiated challenges to avoid these fund transfers as preferences. *See* 11 U.S.C. § 547(b)(4)(A) (2000) (stating that a transfer for benefit of a creditor within 90 days of filing a bankruptcy petition may be avoided by the bankruptcy court).

In November 2000, when no settlement was reached, the bankruptcy trustee initiated a preference action against Rechtzigel in United States Bankruptcy Court demanding judgment against Rechtzigel in the amount of $602,424.76. Before and after the trustee's lawsuit, Rechtzigel filed numerous claims with Fidelity, demanding that pursuant to the title insurance policy Fidelity defend against the bankruptcy trustee's claims and legal action. Fidelity refused, asserting that the title insurance Rechtzigel purchased did not insure against the monetary demands of the trustee. Rechtzigel eventually settled with the bankruptcy trustee for $102,412.20.

After the bankruptcy settlement, Rechtzigel initiated this action, alleging that Fidelity [1] (1) breached its duty to defend and cover losses under the title insurance contract; (2) made negligent misrepresentations by agreeing to deliver a 1987–form policy, but providing a 1992–form policy; (3) breached its contract by switching policy forms; and (4) acted in bad faith. The parties made cross-motions for summary judgment. The district court denied Rechtzigel's motion and granted summary judgment to Fidelity and Pulte Title. This appeal follows.

## ISSUES

I. Did Fidelity have a duty under the title insurance policy to cover losses sustained by Rechtzigel as a result of the bankruptcy trustee's preference action?

II. Did Fidelity have a duty under the title insurance policy to defend against the bankruptcy trustee's preference complaint?

---

**1.** Because the result in this case turns on the language of the 1987 policy, this opinion will generally refer to Fidelity as the respondent, even though all of Rechtzigel's claims are against both Fidelity and Pulte Title.

III. Did Fidelity breach its commitment to Rechtzigel to issue the 1987 policy?

IV. By issuing the 1987 policy, did Fidelity make negligent misrepresentations, causing loss?

## ANALYSIS

On appeal from a grant of summary judgment, this court determines whether the district court erred in its application of the law and whether there are any genuine issues of material fact. *Herrmann v. McMenomy & Severson*, 590 N.W.2d 641, 643 (Minn.1999). In reviewing the record for the existence of a genuine issue of material fact, we view the evidence "in the light most favorable to the party against whom summary judgment was granted." *O'Malley v. Ulland Bros.*, 549 N.W.2d 889, 892 (Minn.1996). But where, as here, all parties move for summary judgment, they tacitly agree that no genuine issue of material fact exists. *Am. Family Mut. Ins. Co. v. Thiem*, 503 N.W.2d 789, 790 (Minn. 1993); *Frey v. United Serv. Auto. Ass'n*, 743 N.W.2d 337, 344 (Minn.App.2008). Where there are no genuine issues of material fact, this court reviews the district court's application of the law de novo. *Leamington Co. v. Nonprofits' Ins. Ass'n*, 615 N.W.2d 349, 353 (Minn.2000).

## I.

▇ The first issue is whether the title insurance policy covers the claims made against Rechtzigel by the bankruptcy trustee. At the outset, Rechtzigel asserts that it contracted for title insurance coverage under the 1987 policy and that Fidelity's duty to cover losses arising out of the preference action must be determined on the basis of the terms of that policy. This point is important because the 1992 policy specifically excludes coverage for bankruptcy preference actions. The 1987 poli-

cy does not contain that exclusion. The district court ruled that whether the trust purchased the 1987 policy or the 1992 policy was irrelevant because neither policy covered this preference action. We begin our analysis by addressing coverage under the 1987 policy.

▇ Title insurance is intended to protect against all loss or damage which the insured sustains by reason of "(1) existing defects in, or unmarketability of title . . .; (2) leases and encumbrances changing the same as of the date of the policy; or (3) defects in title of a mortgagor to the mortgaged estate, or mortgaged interest." 11 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 159:5 (3d ed.2005). "General principles of contract interpretation apply to insurance policies." *Lobeck v. State Farm Mut. Auto. Ins. Co.*, 582 N.W.2d 246, 249 (Minn.1998). Interpretation of an insurance policy and application of the policy to the facts of a particular case are questions of law reviewed de novo. *Am. Family Ins. Co. v. Walser*, 628 N.W.2d 605, 609 (Minn.2001). "When interpreting an insurance contract, words are to be given their natural and ordinary meaning and any ambiguity regarding coverage is construed in favor of the insured." *Id.* Likewise, exclusions in the policy are to be construed narrowly. *Id.*

Fidelity's obligations to Rechtzigel are governed by the language in the insurance policy. The 1987 policy contains the following relevant coverage and exclusion provisions:

### OWNER'S COVERAGE STATEMENT

This policy insures your title to the land . . . .

We insure you against actual loss resulting from:

- any title risks covered by this Policy-up to the Policy Amount

and

- any costs, attorneys' fees and expenses we have to pay under this Policy

## COVERED TITLE RISKS

This Policy covers the following title risks, if they affect your title on the Policy Date.

1. Someone else owns an interest in your title.

. . . .

3. Forgery, fraud, duress, incompetency, incapacity or impersonation.

. . . .

8. There are liens on your title, arising now or later, for labor and material furnished before the Policy Date . . .

. . . .

11. Your title is unmarketable, which allows another person to refuse to perform a contract to purchase, to lease or to make a mortgage loan.

. . . .

14. *Other defects, liens, or encumbrances.*

## EXCLUSIONS

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:

. . . .

3. Title Risks:

. . . .

- that first affect your title after the Policy Date—this does not limit the labor and materials lien coverage in item 8 of Covered Title Risks.

(Emphasis added.) Rechtzigel argues that the bankruptcy trustee's complaint constituted a threat to its title to the farmland that made title unmarketable and that Rechtzigel had to settle with the trustee to eliminate the damages that would flow from the trustee's action.

### A. Preference Action/Threat to the Title to the Farmland.

Claims for unmarketability, liens, and encumbrances are "Covered Title Risks" in the 1987 Policy. We therefore analyze whether the bankruptcy trustee's claims and action created such title risks with respect to the Jackson County farmland that would be covered by the policy.

### 1. The Power of the Bankruptcy Trustee

In a preference action, a bankruptcy trustee may avoid "any transfer of an interest of the debtor in property" made within 90 days before the filing of a bankruptcy petition. 11 U.S.C. § 547(b)(4)(A) (2000); *In re Gateway Pacific Corp. v. Expeditors Int'l of Wash., Inc.,* 153 F.3d 915, 917 (8th Cir.1998). Once it is determined that a transfer can be avoided, the bankruptcy trustee may recover any property, or its value, transferred away from the bankrupt entity. 11 U.S.C. § 550(a) (2000). This recovery can be made as against "the initial transferee of such transfer or the entity for whose benefit such transfer was made. . . ." *Id.* § 550(a)(1). But, "[t]he trustee has the burden of proving each of the elements of a preferential transfer." *Brown v. First Nat'l Bank of Little Rock, Ark.,* 748 F.2d 490, 491 (8th Cir.1984). "One of these elements is that the property transferred must be property of the bankrupt's estate . . . it must be shown that the transfer depleted the debtor's estate." *Id.*

There is no dispute that Rechtzigel's 1031 exchange took place within 90 days of the bankruptcy filing and that over $600,000 had been transferred by Like–Kind, the bankruptcy debtor, in connection with that transaction. For the bankruptcy

trustee to place a lien on or otherwise encumber the farmland or for the bankruptcy to render the title unmarketable, Like–Kind would have to have had a credible interest in the farmland.

### 2. The Requirements of 1031 Exchange

Rechtzigel argues that as a qualified intermediary in a 1031 exchange, Like–Kind must have had an interest in the farmland and the bankruptcy trustee's actions constituted a threat to the marketability of title to the farmland.[2]

Rechtzigel does not cite any Internal Revenue Code provision, tax regulations, or caselaw that requires that the qualified intermediary have an interest in the property being acquired in the exchange. We nonetheless examine the relevant provisions. A qualified intermediary is defined as a person who "[e]nters into a written agreement with the taxpayer . . . and, as required by the exchange agreement, acquires the relinquished property from the taxpayer, transfers the relinquished property, acquires the replacement property, and transfers the replacement property to the taxpayer." Treas. Reg. § 1.1031(k)–1(g)(4)(iii)(B) (as amended in 2002). However, the transferring party can "receive money or other property directly from a party to the transaction other than the qualified intermediary" without losing the tax advantage of the 1031 exchange. *Id.* § 1.1031(k)–1(g)(4)(vii). The Internal Revenue Service has held these provisions to mean that "the transfer of property in a deferred exchange that is facilitated by the use of a qualified intermediary may occur via a 'direct deed' of legal title by the current owner of the property to the ulti-

mate owner." 1 Robert J. Haft & Peter M. Fass, *Tax Adv. Sec. Handbook* § 2:13[5][P][iv] (2007); Rev. Rul. 90–34, 1990–1 C.B. 154.

Here, the law allowed Rechtzigel and Like–Kind to have the owners of the farmland transfer the farmland directly to Rechtzigel without negative tax consequences to Rechtzigel.

### 3. The 1031 Exchange in this Case

The nature of the transaction in this case provides very limited support for Rechtzigel's claim that Like–Kind had an interest in the farmland. Rechtzigel points to the 1031 contract, which provides that Like–Kind undertook the obligation "to purchase [the farmland] . . . conditioned upon [Rechtzigel's] performing all other obligations required . . . ." The transaction is summed up in a "Legal Notice" that Like–Kind gave to Rechtzigel that states

> [n]otice is hereby given that [Rechtzigel] assign[s] it's [sic] right to purchase the interest in [the Jackson County farmland] . . . to Like–Kind Exchange Services . . . in accordance with the terms of the Phase 4 Delayed Exchange & Assignment Agreement. . . .
>
> In order to prevent the duplication of transfer fees, escrow costs, title insurance expenses and the like, title to [the farmland] property is to be transferred directly to [Rechtzigel] in accordance with the provisions of the Agreement.

While the first paragraph of the Legal Notice appears to state that Like–Kind contracted to hold an interest in the farmland, the second paragraph takes the contrary position that the Jackson County

---

**2.** Parties seeking the tax benefits incident to their transfer of property in a three-way exchange are often advised to use a qualified intermediary to stay within the "safe harbor" provisions of Treas. Reg. § 1.1031(k)–1(f)(1),

(3) (as amended in 2002). *See* Michael J. Nathanson, *Deferred Like–Kind Exchanges in 20 Easy Steps,* 25 Tax'n For Law. 86, 93 (1996).

owners planned to directly transfer the farmland to Rechtzigel. This second paragraph is in accord with the contract for sale of the farmland, which also states that it is to be transferred directly by its Jackson County owners to Rechtzigel. Most importantly, the deed actually runs directly from those owners to Rechtzigel. Therefore, the district court correctly found that Like–Kind never had any interest in or possession of the Jackson County farmland.

Because Like–Kind never had possession of, or an actual interest in, title to the farmland, we conclude that the bankruptcy trustee could not have included the farmland in the preference action. *See* 11 U.S.C. §§ 547(b), 550(a).[3]

### 4. Trustee's Claims

The bankruptcy trustee's claims in the preference action are in accord with the foregoing conclusion. Although Rechtzigel contends that the trustee was referring to the fair market value of the farmland when it demanded judgment against Rechtzigel, we disagree. The trustee's complaint first describes a typical 1031 exchange and Like–Kind's role in that exchange. As described by the complaint, Like–Kind would typically hold *sale proceeds* of an

"exchangor." [4] Here, Like–Kind received cash in the amount of $602,424.76 from Pulte Homes, delivered $600,000 to the closing agent to pay for the farmland, and paid the balance to Rechtzigel. The $602,424.76 received by Like–Kind is all that the bankruptcy trustee sought to recover. The trustee never made any claim against the farmland. The farmland had been identified and directly transferred to Rechtzigel from its Jackson County owners before any bankruptcy.

The trustee's focus was on the money, not the farmland, as shown by the complaint's explanation of the reason for the preference action. The complaint recites that Like–Kind used Rechtzigel's money, commingled with proceeds from other exchangers, to pay for the farmland. Ownership of the farmland was never commingled with other properties or assets. The discussion of the commingled funds in the bankruptcy trustee's complaint indicates that the trustee's focus was on the sale proceeds of exchanged properties. For that reason, the bankruptcy trustee demanded judgment against Rechtzigel in the amount of $602,424.76—the amount of money transferred from Like–Kind to purchase the farmland, as well as a small

---

**3.** It is doubtful that the bankruptcy trustee would have been able to recover the property in a preference action, or place a lien or encumbrance on the property, even if Like–Kind had held title to the farmland. In another bankruptcy case, the replacement property was actually deeded to the qualified intermediary, but the intermediary had not deeded that property to the exchanging party before the intermediary went bankrupt. *In re Nation–Wide Exchange Servs., Inc.*, 291 B.R. 131 (Bankr.D.Minn.2003). The bankruptcy trustee refused to tender a deed on behalf of the qualified intermediary to the exchangor for the replacement property, despite the fact that the exchangor had complied with all of its contractual obligations. *Id.* at 153. The bankruptcy court held that the bankruptcy trustee had an obligation to immediately deed

the replacement property to the exchangor because the bankruptcy estate succeeded to the position of the bankrupt qualified intermediary, and the intermediary had a duty to perform the contract. *Id.* at 153–54. As applied here, *Exchange Services* suggests that even if Like–Kind had been deeded the farmland, the bankruptcy trustee would have been obligated to execute a deed and transfer title to Rechtzigel because Rechtzigel performed all of its obligations under the contract.

**4.** The exchangor is the person or entity who, like Rechtzigel, would use Like–Kind to sell a parcel of property that it owned originally and to distribute those proceeds when a second parcel is conveyed.

monetary sum transferred to Rechtzigel. It was this monetary transfer that the trustee sought to recover as a preference.[5] Like–Kind held the money, but never owned the farmland and never held the deed in its possession.

### 5. Conclusion

The title insurance policy provides coverage for title risks that are defects, liens, encumbrances or other conditions that render title unmarketable. Because the bankruptcy trustee did not take any action that would create a lien or encumbrance on the farmland or that otherwise affected the property's marketability, we conclude that the district court did not err in granting summary judgment to Fidelity, dismissing Rechtzigel's claim for coverage under the 1987 policy for its losses arising out of the preference action. Because the parties agree that the 1992 policy form does not afford coverage for Rechtzigel's claims beyond the 1987 policy, we further conclude there is no coverage under the 1992 policy.

### B. Title Threats after the Policy Date

Fidelity also points out that this bankruptcy-preference claim is inconsistent with the title insurance theory. Unlike most insurance, which protects against future occurrences, "title insurance is protection against future loss because of past events." 44 C.J.S. *Insurance* § 22 (2007). "In essence, the insurance is a state of ownership at a specific point in time." 11 *Couch on Insurance* § 159.5. The risk covered is retrospective; only the discovery of the defect is usually prospective. *Id.* Thus, "title insurance primarily seeks to eliminate risks and losses caused by defects in title arising out of past event[s]; it

... has no relation to liens or encumbrances that arise after issuance of the policy." *Id.* § 159.25. These general principles are reflected in the 1987 policy. Its coverage extends only to defects existing on the policy date, and the policy specifically excludes all title risks except labor and material liens arising after that date.

Fidelity argues that because the policy date is March 8, 2000, and Like–Kind filed bankruptcy on April 25, 2000, the bankruptcy was a post-policy-date event and the 1987 policy does not provide coverage. Rechtzigel disputes this argument, pointing out the 90–day look-back nature of a preference action. Because of our determination that this preference action by the bankruptcy trustee did not constitute a threat to Rechtzigel's title to the farmland and that for that reason there is no coverage, we do not reach this question.

### II.

▇▇▇ The next issue is whether Fidelity had a duty to defend Rechtzigel against the preference action. The existence of a duty to defend is a legal question reviewed de novo. *Franklin v. W. Nat'l Mut. Ins. Co.*, 574 N.W.2d 405, 406 (Minn.1998). The duty to defend is broader than the duty to indemnify. *Id.* It "arises when any part of the claim against the insured is arguably within the scope of protection afforded by the policy." *Id.* at 406–07. To determine whether Fidelity had a duty to defend requires a comparison of the allegations in the complaint of the preference action with the relevant language in the title insurance policy. *See Ross v. Briggs and Morgan*, 540 N.W.2d 843, 847 (Minn. 1995). If any part of the claims in the preference action arguably fell within the

---

5. We were not presented with a situation in which the bankruptcy trustee pursued the other parties to the 1031 exchange, such as the owners of the farmland, and do not consider

whether such a challenge might under some scenario have resulted in a claim that affected marketability of Rechtzigel's ownership of the farmland.

scope of the insurance policy's coverage, Fidelity had a duty to defend. *Id.*

The 1987 policy provision concerning "duty to defend" states that "[w]e will defend your title in any court case as to that part of the case that is based on a Covered Title Risk insured against by this Policy." As previously discussed, the owners of the farmland conveyed title directly to Rechtzigel. Like–Kind never held the deed for delivery to Rechtzigel, and Like–Kind never possessed any attribute of ownership of the farmland. The bankruptcy trustee was without authority to avoid the transfer of the property from the farmland owners to Rechtzigel and therefore could not include the farmland in the preference action. Neither the trustee's demand letter to Rechtzigel nor the preference action challenged Rechtzigel's ownership of the farmland. Instead, the bankruptcy trustee challenged only the transfer of $602,424.76 and sought to recover that amount from Rechtzigel.

Because the preference action did not arguably fall within the scope of coverage of the 1987 policy, we conclude that Fidelity had no duty to defend Rechtzigel against the preference complaint, and district court did not err in granting summary judgment on the duty-to-defend issue.

### III.

■ The third issue is whether the issuance of a title insurance policy using the 1992 policy form instead of the 1987 policy form constituted a breach of contract by Fidelity and Pulte Title. A contract does not exist without an offer, acceptance, and consideration. *Murray v. MINNCOR*, 596 N.W.2d 702, 704 (Minn. App.1999), *review denied* (Minn. Sept. 28, 1999). But without damages, a breach-of-contract action fails as a matter of law. *Jensen v. Duluth Area YMCA*, 688 N.W.2d 574, 578–79 (Minn.App.2004).

Here, Pulte Title issued Rechtzigel a commitment to sell a 1987 policy. This constitutes an offer. After receiving that commitment, Rechtzigel paid for title insurance. This action constituted acceptance. It is undisputed that the policy Rechtzigel received was a 1992, not a 1987, policy. As previously stated, the 1992 policy excluded coverage against preference actions by bankruptcy trustees, the very risk encountered by Rechtzigel. For purposes of considering this issue, we assume that this substitution of policy forms was improper.[6] However, because we have determined that the 1987 policy did not cover damages from or impose a duty to defend against the claims in this preference action, we conclude that Rechtzigel suffered no damages as a result of this claimed breach of contract and that the district court did not err in granting summary judgment to Fidelity and Pulte Title on the breach-of-contract claim.

### IV.

■ The last issue is whether summary judgment was appropriate regarding Rechtzigel's negligent-misrepresentation claim. A negligent-misrepresentation action is defined as follows:

**6.** Fidelity disputes the claim that the use of the 1992 policy was a wrongful substitution. Fidelity points out that the 1987 policy form is for insuring one to four family residences, that it is not intended for insuring rural land, that the policy form warns a policy holder that if its property is not such a residential lot, the policyholder should contact the insurance company immediately, and that Pulte Title made a clerical error in referring to the 1987 policy form. We also note that Fidelity was not aware of the Like–Kind bankruptcy until after the policy was issued. Because the merits of this defense do not affect the outcome of this case, we do not further consider this aspect of the issue.

One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Smith v. Brutger Cos.*, 569 N.W.2d 408, 413 n. 3 (Minn.1997).

According to Rechtzigel, Pulte Title had a duty of reasonable care in its dealings. Rechtzigel argues Pulte Title made a negligent representation by stating Rechtzigel would receive a 1987 policy and later sending it a 1992 policy. Assuming that this indeed was an otherwise actionable misrepresentation, this claim has the same damages problem as the breach-of-contract claim. We conclude that because supplying a 1992 policy instead of a 1987 policy did not cause pecuniary loss, the district court did not err in granting summary judgment to Pulte Title and Fidelity and dismissing the negligent-misrepresentation claim.

## DECISION

Because respondents Fidelity and Pulte Title had no duty to cover losses related to or defend against the bankruptcy trustee's preference claims and because respondents' actions did not cause damages, the district court did not err when it granted summary judgment in respondents' favor.

**Affirmed.**